No. 1-15-1381

2018 IL App (1st) 151381

THIRD DIVISION
September 28, 2018

No. 1-15-1381

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 12269 |
| | ) | |
| RANDY EDMONDSON, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment and opinion.

**OPINION**

¶ 1    A jury convicted defendant Randy Edmondson of the first degree murder of Jose Escobar and the attempted murder of Alberto Rivera. The trial court instructed the jury on self-defense as to both charges and on second degree murder based on "imperfect" or "unreasonable" self-defense. But defense counsel did not argue any of these self-defense theories to the jury. Instead, counsel argued a theory of reasonable doubt—contending that the witnesses could not reliably identify defendant as the shooter—that was inconsistent with these theories.

¶ 2    Defendant contends, for this reason, that counsel was ineffective in closing argument. He also claims that it was plain error not to modify the Illinois Pattern Instructions (IPI) for attempted murder. Without certain modifications, he says, those instructions could have led the jury to convict him of attempted murder based on a finding that he attempted to kill Escobar (the

1

murder victim) rather than Rivera (the attempted-murder victim). Alternatively, he contends that counsel was ineffective for failing to object to the unmodified instructions.

¶ 3                                    BACKGROUND

¶ 4      The victims, Jose Escobar and Alberto Rivera, were shot in front of Johnny O's, a hotdog stand at 35th and Morgan Streets, around 5:00 a.m. on September 30, 2012. Escobar was shot in the head and died on the scene. Rivera survived, but his injuries left him paralyzed and reliant on a wheelchair.

¶ 5      Rivera testified about the shooting and the events leading up to it. Rivera and Escobar left a party nearby and went to Johnny O's for a bite to eat. Rivera drank a few beers throughout the night and used cocaine at the party. Escobar was drunk. They were both Latin Kings.

¶ 6      The line in front of Johnny O's was a friendly scene. The customers chatted and mingled on the sidewalk while they waited for their food. Rivera, a car salesman, gave out his business card and tried to sell someone a car.

¶ 7      Defendant and his friend, Rafael Diaz, walked up to the line. Rivera did not know either of them. Rivera first noticed them after Diaz and Escobar started arguing. Escobar was upset that Diaz wore his hat tilted to the right, which Escobar took as a sign of opposition or disrespect to the Latin Kings. Rivera tried to calm Escobar down. And so did defendant, who repeatedly told Escobar, "we don't gang bang."

¶ 8      Julius Williams, another Johnny O's customer, testified that he arrived in the midst of a heated and escalating dispute. Williams did not know any of the people involved, and he heard only "bits and pieces" of their argument. But he did recall Escobar asking defendant and Diaz if they were "Kings," and defendant responding, "we don't gang bang."

¶ 9       At some point, Escobar took off his hoodie. Diaz motioned off to the side and said, "if you want to go, then let's go over here." Diaz stepped away from the line, and Escobar followed. Escobar shoved Diaz. The two squared off, with their fists raised, as if they were about to fight. But they never did.

¶ 10      Rivera testified that he tried to break them up. At first, defendant did too. But then defendant, who was standing somewhere behind Escobar, pulled a revolver out of his waistband; "swung around in front of" Escobar; put a gun "in his face"; and shot him.

¶ 11      Rivera turned and ran, but he was shot from behind while trying to flee. Rivera fell to the ground and was shot two more times. He tried to move, but he could not feel his legs. In all, he suffered three gunshot wounds—to his back, shoulder, and left leg.

¶ 12      Williams testified that defendant, who was standing off to the side of Escobar, walked up to Escobar and put a long-nose revolver to his head. The gun was "[r]eally close. Like, point-blank range." Williams immediately turned and ran. While he was fleeing, he heard a single gunshot, and then about four more gunshots fired in quick succession. Williams escaped safely and ran to his apartment nearby.

¶ 13      Neither Rivera nor Williams saw anyone at Johnny O's with a gun, or any other weapon, other than defendant. Rivera also testified that he was unarmed.

¶ 14      The medical examiner found that Escobar was shot at close range, meaning from, at most, three feet away. The cause of his death was a single gunshot wound to the face. The police did not recover the shooter's gun. The forensic investigator testified that the absence of any casings at the scene strongly suggested (but did not prove) that the shooter used a revolver.

¶ 15    The witnesses' accounts of the events leading up to the shooting were corroborated, in all essentials, by video footage from a Johnny O's surveillance camera. Rivera and Williams viewed and identified various clips, and the entire video was published to the jury.

¶ 16    Before defendant and Diaz arrived, Rivera is seen mingling with the other customers for several minutes. Escobar is visibly drunk, often swaying and propping himself up against the counter. Soon after defendant and Diaz join the line, Escobar and Diaz begin to argue. Escobar repeatedly gets in Diaz's face, and both are evidently agitated. Most of the argument is inaudible, but at various points Escobar says to Diaz, "respect me ni***." Rivera makes several efforts to calm Escobar down, and defendant repeats, "we don't gang bang" numerous times.

¶ 17    After a few minutes, Diaz and Escobar step away from the counter. Escobar takes off his hoodie, and Diaz raises his fists in the air, as the two square off to fight. Escobar pushes Diaz, but otherwise the details of their confrontation are not evident on the video.

¶ 18    Meanwhile, defendant and Rivera start walking over toward Diaz and Escobar. Along the way, defendant, who had a phone in his right hand, appears to reach into his waistband with his left. A couple of seconds later, Williams turns and starts running. Someone yells "back up," and a single gunshot is audible. Rivera turns and runs, but as five more gunshots are fired in quick succession, Rivera falls to the ground.

¶ 19    Victoria Garza, defendant's friend and Diaz's girlfriend, testified to the events that immediately followed the shooting. Garza and Diaz shared an apartment across the street from Johnny O's. On the night of the shooting, they went out with some friends. Garza could not recall whether defendant was with them. When they returned, in the wee hours, Garza was drunk. She got ready for bed, and Diaz went to Johnny O's.

¶ 20    After that, Garza testified, her recollections were sparse: She heard a loud boom outside. Defendant soon came over, agitated and out of breath. Garza and defendant met up with Diaz in the garage, got into Garza's car, and drove toward Indiana on the Dan Ryan Expressway. Defendant got out somewhere near the expressway, but she could not recall where.

¶ 21    After claiming not to recall any further details of the evening, Garza was impeached with her grand-jury testimony and handwritten statement. In those prior statements, Garza had said, among other things, that defendant came to the apartment and asked her to "get me out of here." Defendant first asked Garza to drive him to a friend's house on Dempster Street; then he asked for a ride to Indiana. In the car, Diaz said to defendant, "F---, what did you do?" and asked why he gave the victim "a dome shot" (meaning, a shot to the head). Defendant cried, told Diaz that he was not going to "county," and said that he wanted to kill himself. Defendant eventually got out of the car at 47th and the Dan Ryan.

¶ 22    Officer Crawley of the Danville Police Department testified that he arrested defendant, for unrelated reasons, on May 24, 2013—almost nine months after the shooting and 140 miles from Chicago. Officer Crawley learned that defendant had an outstanding arrest warrant for a murder and had him transferred to the Chicago Police Department.

¶ 23    Once in custody in Chicago, defendant was identified in separate physical line-ups by Rivera and Williams, both of whom had previously identified him in the Johnny O's surveillance video, and in photo arrays generated from that video.

¶ 24    After consulting with his attorney, defendant chose not to testify.

¶ 25    The jury received pattern instructions for the offenses of first degree murder and attempted murder. At defendant's request, and over the State's objection, the trial court instructed the jury on self-defense, with respect to both charged offenses; and on the mitigated

offense of second degree murder, based on defendant's unreasonable belief that self-defense was necessary. The trial court found that there was a basis in the evidence for self-defense and second-degree-murder instructions, because there was "some contact" between Escobar and Diaz "immediately prior to the shooting."

¶ 26    Defense counsel did not argue any theories of self-defense or second degree murder to the jury. Instead, counsel's closing argument developed a theory of reasonable doubt, based on the witnesses' alleged inability to reliably identify defendant as the shooter.

¶ 27    The jury found defendant guilty of the first degree murder of Escobar and the attempted murder of Rivera. The jury also found that defendant personally discharged a firearm that proximately caused Escobar's death and Rivera's permanent disability. The trial court sentenced defendant to an aggregate term of 85 years in prison: 25 years for murder, 10 years for attempted murder, and 25 years for each firearm enhancement. This appeal followed.

¶ 28                                    ANALYSIS

¶ 29                                       I.

¶ 30    As noted, at the defense's request, the trial court instructed the jury on self-defense, as to Escobar's murder and the attempted murder of Rivera; and on second degree murder, based on "imperfect" or "unreasonable" self-defense. The trial court found that the slight "contact" between Escobar and Diaz "immediately prior to the shooting" provided a sufficient evidentiary basis for submitting these theories to the jury.

¶ 31    But counsel never argued to the jury that defendant shot Escobar or Rivera in self-defense, or at least, in the case of Escobar, with a sincere but unreasonable belief that self-defense was necessary. Instead, having requested those instructions—all of which assume that

defendant was the shooter—counsel devoted her closing argument to laying out a theory of reasonable doubt. Counsel argued that neither Rivera nor Williams could credibly and reliably identify defendant as the shooter, for a host of reasons—their vantage points, observations, and recollections were in various ways limited; the lighting was poor at 5 a.m., and the Johnny O's camera had a low-light intensifier, so it did not give an accurate depiction of the true lighting conditions; and Rivera had been drinking and using cocaine, to name but a few.

¶ 32     Defendant contends that counsel's approach to closing argument rendered her ineffective. Because the jury was instructed on self-defense and second degree murder, he says, counsel was *required* to argue these theories to the jury. Thus, counsel either had to abandon her reasonable-doubt argument entirely or argue his defenses in the alternative: defendant did not shoot the victims; but if he did, he had a (full or partial) justification for doing so. Either way, defendant says, counsel could not simply "abandon" the theories that the jury was instructed to consider.

¶ 33     To show that counsel was ineffective, defendant must show that a deficiency in counsel's performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To be deficient, counsel's representation must be objectively unreasonable under prevailing professional norms. *People v. Easley*, 192 Ill. 2d 307, 317 (2000). Defendant must overcome a "strong presumption" that counsel's alleged error was part of a "sound trial strategy." *People v. Houston*, 226 Ill. 2d 135, 144 (2007). Deficient representation is prejudicial if there is a "reasonable probability" that the outcome of the trial would have been different if not for counsel's error(s). *Id.* A reasonable probability is one that undermines confidence in the verdict. *Id.*

¶ 34     Where the facts relevant to an ineffective-assistance claim are not in dispute, our review is *de novo*. See, *e.g.*, *People v. Nowicki*, 385 Ill. App. 3d 53, 81 (2008).

¶ 35 The crux of defendant's claim is that a jury instruction is all but worthless unless counsel articulates a supporting theory in closing argument. Instruction and argument, he says, "go hand in hand"—so much so that "only a jury armed with both *** can find in a defendant's favor." Counsel's "pursuit of one absent the other" is *per se* unreasonable and thus deficient.

¶ 36 We reject this bright-line rule and the novel constraints it would impose on counsel. To begin, the "content of closing argument" has long been recognized as a quintessential matter of trial strategy. See, *e.g.*, *People v. Shamlodhiya*, 2013 IL App (2d) 120065, ¶ 15 (citing cases). Any effective closing argument will "sharpen and clarify the issues" for the jury, but "which issues to sharpen and how best to clarify them are questions with many reasonable answers." (Internal quotation marks omitted.) *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003). Thus, "deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Id.*

¶ 37 Applying these principles in a context similar (albeit not identical) to this case, we have repeatedly held that counsel is not required to argue a theory of defense simply because the jury was instructed on it. Specifically, we have held that counsel can reasonably pursue an "all-or-nothing strategy" (that is, seek a full acquittal) in closing argument, even when the jury, at the defendant's request, has been instructed on a lesser-included offense. See, *e.g.*, *People v. Jackson*, 2018 IL App (1st) 150487, ¶¶ 28-32 (citing cases). Counsel's decision not to argue a theory of the lesser-included offense—even in the alternative—is generally a "valid trial strategy" (*People v. Walton*, 378 Ill. App. 3d 580, 589 (2007)), and the "[t]he mere fact that [it] proved unsuccessful" does not mean that the strategy was unreasonable. *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 28.

¶ 38    When the instructions provide alternative theories that counsel could reasonably argue to the jury, we do not second-guess counsel's strategic decisions as to which, or how many, of those theories to articulate. And we think this general point holds whether counsel chooses to forgo argument on a lesser-included offense or—as in this case—on an affirmative defense (self-defense) and a mitigated, but not lesser-included, offense (second degree murder). See *People v. Jeffries*, 164 Ill. 2d 104, 122 (1995) (second degree murder is not lesser-included offense of first degree murder).

¶ 39    If anything, we might be *more* suspect of counsel's decision not to argue a theory of a lesser-included offense. The decision to request that instruction belongs to the defendant personally, and is thus outside counsel's strategic control of the case. *People v. Brocksmith*, 162 Ill. 2d 224, 228 (1994). But even then, a defendant's exercise of his personal right to request a lesser-included instruction does not bind counsel to argue that instruction to the jury. See, *e.g.*, *Jackson*, 2018 IL App (1st) 150487, ¶ 32 (counsel not obliged to "alter *** trial strategy" when lesser-included instruction given at defendant's request). Arguably, there is even less basis for imposing that constraint on counsel here.

¶ 40    In this context, defendant asserts that the decision to request self-defense and second-degree-murder instructions *was* legally his own, not counsel's. Even if that were true, it would not be enough, for the reasons we just explained. And it is false, anyway. It is counsel's decision, as a matter of trial strategy, whether to assert an affirmative defense of self-defense. See, *e.g.*, *People v. Sanchez*, 2014 IL App (1st) 120514, ¶ 31. And our supreme court has held—in a case defendant cites—that the decision to request a second-degree-murder instruction does not belong to a defendant personally, because second-degree murder is not a lesser-included offense of first-degree murder (or anything else). *People v. Wilmington*, 2013 IL 112938, ¶¶ 44-48.

¶ 41    Sometimes, it is entirely reasonable—even wise—for the defense to forgo argument on an instruction given at its own request. An instruction on an affirmative defense, like self-defense, gives the jury one more option, one more legal basis, for finding in the defendant's favor. And from the defense's perspective, more such options should usually be welcome.

¶ 42    But that does not mean that counsel is always wise to broach every such instruction in closing argument. Counsel may well think that a different—perhaps conflicting—theory is more likely to persuade the jury, and thus will focus on sharpening *those* issues. Counsel should be free to argue whatever defense is most promising, in counsel's reasonable professional judgment, while still offering the jury alternative grounds for a favorable verdict, in the event it sees the facts differently. If defense attorneys *had* to argue an instruction just because it was given, they would likely seek fewer such instructions, to avoid being hemmed in—but thereby leaving the jury with fewer options for finding in the defendant's favor.

¶ 43    Of course, as defendant suggests here, counsel could argue the defenses in the alternative. A defendant has the right " 'to present as many defenses as he had *or thought he had*,' " even if some of them are " 'conflicting.' " (Emphasis in original.) *People v. Everette*, 141 Ill. 2d 147, 155-56 (1990) (quoting *People v. Jersky*, 377 Ill. 261, 267 (1941)); see also *Mathews v. United States*, 485 U.S. 58, 62-66 (1988). But it is one thing to give the jury alternative instructions; it is quite another to articulate conflicting theories in closing argument. As the Seventh Circuit has recognized, "[a] rule that counsel should argue all available defenses as a matter of course would make many clients worse off," since "a defendant who advances an inconsistent argument may shoot himself in the foot by implicitly conceding part of the prosecution's case, or by making the defense seem unprincipled." *Wilson v. United States*, 414 F.3d 829, 831 (7th Cir. 2005). Lawyers

may take it in stride, but an argument that "the defendant did not do it; but if he did, he did it in self-defense" may strike lay jurors as "unprincipled," indeed.

¶ 44    Defendant cites various cases (we need not go through them) holding that counsel is *per se* deficient in "the reverse situation"—that is, where counsel argues a theory to the jury but fails to request the related instruction. That is completely different: Without the instruction, the jury has no legal basis for finding in the defendant's favor. The jury is presumed to follow the trial court's instructions (*Wilmington*, 2013 IL 112938, ¶ 49), so if the instructions do not say that self-defense, for example, is a basis for acquittal, then counsel's argument cannot turn it into one. Arguing a defense that the jury cannot legally credit is not a reasonable trial strategy.

¶ 45    But if the instructions *do* say that self-defense (or whatever else) is a basis for acquittal, then the jury can consider it—even if counsel thinks the best bet is to home in on other issues in closing argument. Defendant says that the jury needs both the instruction and the argument to acquit. But all the jury *needs* is the instruction. The argument, no doubt important in most cases, is sometimes better left unsaid. And it is counsel's role to determine when that is so.

¶ 46    We therefore decline to adopt a bright-line rule requiring counsel to argue a defense simply because the jury was instructed on it. We need not go to the other extreme, and hold that counsel can *never* be deficient for deciding not to do so. See *Wilson*, 414 F.3d at 831 ("The Supreme Court has abjured bright-line rules under the sixth amendment ***."). But we are confident that counsel had no such duty here.

¶ 47    That confidence is further bolstered by the weakness of the self-defense and second-degree-murder theories that defendant says should have been argued to the jury. We think this point goes to both the deficiency and the prejudice prongs of *Strickland*: Given the weakness of

these theories, it was not unreasonable for counsel to argue a different one; and given their weakness, we are confident that counsel's decision did not affect the verdict.

¶ 48 We begin with defendant's claim of self-defense against Escobar, the murder victim. We note, at the outset, that the jury was only instructed on self-defense, not defense of another; thus, defendant could not argue that he was protecting Diaz from a threat posed by Escobar. (Recall that Escobar shoved Diaz shortly before defendant shot him, and that was the trial court's stated basis for giving this instruction.) As the jury was instructed, it had to find that defendant "reasonably believe[d]" that his use of deadly force was "necessary to prevent imminent death or great bodily harm to himself." See Illinois Pattern Jury Instructions, Criminal, Nos. 24-25.06 (4th ed. 2000) (hereinafter IPI Criminal 4th).

¶ 49 Assume, for the moment, that defendant believed his life was in imminent danger, and that Escobar was the perceived source of the threat. What evidence could counsel have marshaled to convince the jury that defendant's belief was reasonable?

¶ 50 There is no evidence that Escobar threatened defendant, even if only verbally. Escobar's drunken—and almost purely verbal—belligerence was directed at Diaz. Any physical threat that Escobar may have posed was also directed at Diaz, not defendant. Indeed, to shoot Escobar, defendant had to walk over to him and come around him from behind. And any physical threat from Escobar was minimal to boot: Escobar shoved Diaz once, and then squared off against Diaz for a fistfight. But it never even came to blows between Escobar and Diaz—much less defendant—since defendant stepped into the mix, at that point, and shot Escobar in the face.

¶ 51 Escobar was unarmed, and defendant had no particular reason to believe otherwise. As he squared off against Diaz, Escobar's hands were in front of him, and thus visible. Defendant could not reasonably think that Escobar was reaching for a gun.

¶ 52     As defendant emphasizes, his (supposed) belief that his life was in imminent danger could have been reasonable even if it was ultimately mistaken. *People v. Pinkney*, 322 Ill. App. 3d 707, 721 (2000) (reasonable but mistaken belief supports claim of self-defense). Perhaps the jury may have come to that conclusion if, say, Escobar had threatened to shoot defendant, but in retrospect that turned out to be bluster. Or perhaps defendant could have mistakenly thought that Escobar was about to reach into his pocket for a gun, when really he was just lowering his fists to de-escalate. But the evidence revealed nothing of the sort. If defendant believed that his own life was in imminent danger, the evidence did not bear out the claim that his belief was reasonable.

¶ 53     Defendant emphasizes that he tried to defuse the tension between Escobar and Diaz. That may show that defendant did not go out *looking* to kill anyone that night. But it does not show that he had a rational, if ultimately mistaken, belief that Escobar was about to kill (or severely injure) him. Counsel had no realistic hope of convincing the jury that he did.

¶ 54     As a defense to the attempted murder of Rivera, a claim of self-defense fares even worse. It is beyond dispute that Rivera never posed any threat to defendant (or anyone else). Before the shooting, Rivera can be seen on the surveillance video mingling and handing out his business card. He was in a jovial mood. When Escobar and Diaz started having words, Rivera repeatedly tried to calm Escobar down. Rivera never flashed a gun, and he was not carrying one. Nothing in Rivera's actions or demeanor before the shooting could have reasonably suggested to defendant that Rivera posed a threat to his life.

¶ 55     And yet, after shooting Escobar, defendant turned his gun on Rivera. At the time, Rivera was not advancing on defendant or reaching into his pockets; he was running from defendant's gunfire. As Rivera fled, defendant shot him in the back. As Rivera lay on the ground, unable to move, defendant kept shooting him. It is borderline impossible to imagine that a jury would ever

find that defendant reasonably, if mistakenly, perceived Rivera as a deadly threat in these circumstances. And no jury would ever find that defendant was justified in shooting him.

¶ 56 That leaves second degree murder. To find defendant guilty of this mitigated offense, the jury had to find that defendant sincerely, albeit *un*reasonably, believed that Escobar posed an imminent threat to his life or safety. See 720 ILCS 5/9-2(a)(2) (West 2016). But even this more modest proposition is one that counsel would have been hard-pressed to argue, based on the evidence available to her.

¶ 57 At best, counsel could have reminded the jury that defendant knew Escobar was a gang member, that Escobar was belligerent and felt disrespected (by Diaz's crooked hat), and that defendant's efforts to assuage Escobar had failed. In response to these circumstances, defendant grew fearful that Escobar might turn violent, not only toward Diaz, but toward defendant, too.

¶ 58 This is "some evidence," however "slight" or "tenuous" it may be, to support a second-degree-murder theory—enough, that is, to justify the instruction. See *People v. McDonald*, 2016 IL 118882, ¶ 25; *Everette*, 141 Ill. 2d at 156; *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 56. But not enough to meet *Strickland*'s far more demanding standard—or to come anywhere close. Escobar could barely hold himself up at times; as seen on the video, he often had to lean against the counter. He was paying no attention at all to defendant. His back was turned to defendant, and his hands were in the air, as he squared off against Diaz for some one-on-one fisticuffs. It is hard to believe that defendant really feared that his own life was in imminent danger at that moment, or that defendant deliberately put himself in the line of any such perceived danger when he stepped in front of Escobar to shoot him. And when Diaz later asked defendant why he shot Escobar in the head, defendant said nothing to suggest that he had feared for his life—instead, he said that he feared going to "county."

¶ 59    We could pose many more doubts that we think the jury would have had, but we will not. It suffices to say that any one of the available defense theories would have been a hard sell, in light of the testimony and the surveillance footage. Which one(s) to argue was a matter best left to counsel's strategic judgment, which we cannot say was exercised unreasonably in this case. And we are confident that the jury's verdicts would have been the same—whichever defense theories counsel had argued.

¶ 60                                    II.

¶ 61    Defendant contends that it was error not to modify the IPI instructions for attempted murder, which state that a person commits the offense if, among other things, he acts "with the intent to kill *an individual*." (Emphasis added.) IPI Criminal 4th Nos. 6.05X, 6.07X. Applying these instructions literally, defendant says, the jury could have found him guilty of the attempted murder of Rivera without finding that he had the specific intent to kill *Rivera*. Instead, the jury could have found that he had a specific intent to kill *Escobar*. In other words, the jury could have convicted him of both offenses—the murder of Escobar and the attempted murder of Rivera— based solely on his shooting of Escobar.

¶ 62    Given this risk of jury confusion, defendant argues, the instructions were substantially defective, and therefore plain error, under Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013); alternatively, counsel was ineffective for failing to object to the instructions.

¶ 63    Jury instructions must accurately convey the "essential characteristics" of the charged crime. (Internal quotation marks omitted.) *People v. Ogunsola*, 87 Ill. 2d 216, 222 (1981). An instruction is reversible error if it "creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law." *People v. Hopp*, 209 Ill. 2d 1, 8

(2004). The question is whether "ordinary persons acting as jurors" would understand the instruction. *People v. Herron*, 215 Ill. 2d 167, 187-88 (2005). The IPI instructions have been carefully drafted for this purpose, and a trial court may only deviate from them to accommodate "unusual facts" or intervening changes in the law. Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013); *People v. Durr*, 215 Ill. 2d 283, 301 (2005); *Hopp*, 209 Ill. 2d at 7; *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 40. We review *de novo* the question whether an instruction accurately conveyed the law. *Herron*, 215 Ill. 2d at 174.

¶ 64    As given to defendant's jury, IPI Criminal 4th No. 6.05X, the definition of attempted murder, provides that a person commits that offense "when he, without lawful justification and with the intent to kill *an individual*, does any act which constitutes a substantial step toward the killing of *an individual*." (Emphases added.) And the pattern issues instruction, IPI Criminal 4th No. 6.07X, uses the same phrase—"an individual"—in both the mental-state and conduct elements. (The trial court, perhaps inadvertently, did not give the issues instruction as it appears in the IPI. The written version used the phrase "*the* individual," again without specifying which one, in both elements. Orally, the trial judge used the phrase "an individual" in the substantial-step element, but then used the phrase "*that* individual" in the intent-to-kill element. But neither party makes any argument based on these complications, and we do not think they would change the outcome anyway, so we can safely put them aside.)

¶ 65    As a preliminary matter, we note that there is a good reason why the IPI instructions are phrased this way. It is not an oversight or a misstatement of the law. Because attempted murder is a specific-intent crime (*People v. Johnson*, 368 Ill. App. 3d 1146, 1157 (2006)), defendant assumes that a necessary element of the offense is the specific intent to kill the victim of the attempted-murder charge, as opposed to somebody else. But that is not always true.

¶ 66    Suppose a defendant fires several gunshots at *A*, with the specific intent to kill him. Some of the shots hit (and kill) *A*. Others hit (and do not kill) *B*, an innocent bystander whom the defendant did not even intend to shoot, much less kill. Obviously the defendant is guilty of the first degree murder of *A*. But he is also guilty of the attempted murder of *B*—even though he did not have the specific intent to kill *B*. It is enough that he had the specific intent to kill *someone*— "an individual"—when he fired the bullet that struck *B*. The doctrine of transferred intent applies to the crime of attempted murder. *People v. Harris*, 2016 IL App (1st) 141744, ¶ 29; *People v. Ephraim*, 323 Ill. App. 3d 1097, 1108-09 (2001).

¶ 67    For this reason, the IPI instructions do not say that the trial court should ordinarily fill in the name of the attempted-murder victim—even when there are multiple victims of the defendant's alleged shooting. See *People v. Malone*, 37 Ill. App. 3d 185, 191 (1976) (name of victim not an element of attempted murder). If the instructions required that level of specificity as a matter of course, they would not be accurate as a general statement of the law of attempted murder.

¶ 68    But we recognize that this is not a transferred-intent case. The State has never argued that theory. And the evidence showed that defendant did not shoot Rivera while shooting at Escobar; he shot Rivera *after* he shot Escobar. These were two distinct acts, not a case of an errant bullet, or a defendant "indiscriminately" shooting at a group of people. See *Ephraim*, 323 Ill. App. 3d at 1108-09. So the jury did, after all, have to find that defendant intended to kill Rivera—not because that is inherent in the elements of the offense, as defendant contends, but because of the specific facts of the case.

¶ 69    Our question, then, is whether these are the kind of "unusual facts" that required the trial court to modify the IPI instructions (which correctly state the law as a general matter) to avoid

confusing the jury. More precisely: Was there a serious risk that the jury would have convicted defendant of the attempted murder of *Rivera* based on a finding that he shot *Escobar* with the intent to kill? Our answer is no.

¶ 70    Defendant bases his argument to the contrary on *Anderson*, 2012 IL App (1st) 103288. Anderson was charged with, and convicted of, the first degree murder of Hart and the attempted murder of Hazziez. *Id.* ¶ 1. Anderson and Hart got into an argument at a restaurant over drug turf. *Id.* ¶ 15. At some point, Hart stepped outside; Anderson followed, gun in hand, and shot Hart. *Id.* ¶¶ 7, 15.

¶ 71    Hazziez, who was standing about 10 feet from Anderson, "took off in his car" after Hart fell to the ground. *Id.* ¶ 7. He heard three more gunshots as he drove away, but he did not know in which direction the shots were fired, and he did not find any bullet holes in his car. *Id.* ¶¶ 7-8.

¶ 72    The only other eyewitness to the shooting was Cooper. At first, he claimed that "nothing happened" at the restaurant, and that he did not remember any shooting taking place there. *Id.* ¶ 10. But in his handwritten statement, Cooper had said otherwise. When Anderson followed Hart outside, Cooper had said, he stepped between them, hoping to calm everyone down. *Id.* ¶ 15. Despite those efforts, Anderson reached around Cooper and shot Hart three times. *Id.* Anderson then turned around and fired two shots "at another man, who had been in the restaurant," but whom Cooper did not identify. *Id.* Cooper recanted his statement at trial, claiming that he had been coerced by a detective and told what to say. *Id.* ¶ 11.

¶ 73    We held that, "under the narrow set of facts of this case," the trial court should have substituted Hazziez's name for the phrase "an individual" in the IPI instructions, and that it was plain error, under the closely-balanced-evidence prong, not to do so. *Id.* ¶¶ 56, 64-66. Without that modification, an "ordinary person" on the jury probably would not have understood that

Hazziez, and only Hazziez, was the subject of the attempted-murder charge, and therefore might have convicted Anderson of the attempted murder (*and* murder) of Hart instead. *Id.* ¶¶ 61, 64-66.

¶ 74    We emphasized in *Anderson* that our holding was narrow and fact-bound. See *id.* ¶ 64. We never held that juror confusion is probable, or that the IPI instructions must be modified, *whenever* a shooting gives rise to an attempted-murder charge against one victim and another charge against a different victim. Rather, as the Second District noted in distinguishing *Anderson*, our conclusion that the IPI instructions were erroneous in that case was shaped by the fact that the evidence was "closely balanced," and in a rather unusual way. See *People v. Cavazos*, 2015 IL App (2d) 120171, ¶¶ 79-80 (pattern instructions would not have confused jury where evidence showed that defendant opened fire at murder and attempted-murder victims while they were walking side-by-side).

¶ 75    To begin, the "evidence was unclear whether there even *was* a victim other than Hart." (Emphasis in original.) *Id.* ¶ 79. The only evidence that there was a second victim came from Cooper's handwritten statement, which he recanted at trial, thus calling his credibility as a witness into doubt. *Anderson*, 2012 IL App (1st) 103288, ¶ 65. And even crediting Cooper's prior statement, there was still no evidence at all that Hazziez was the second victim. *Id.* Indeed, it was unclear that Hazziez was the victim of any crime, much less an attempted murder.

¶ 76    In these unusual circumstances, the jury may have struggled to understand how Hazziez could have been the subject of the attempted-murder charge; and seeking to make sense of those instructions, the jury may well have applied them to Hart instead. Granted, the trial court in *voir dire*, and the State in closing argument, told the jury that the attempted-murder charge applied to Hazziez, but we found that was not enough to dispel the likelihood of confusion, since

the jury was instructed that neither the indictment nor closing argument was to be considered as evidence. *Id.* ¶ 62.

¶ 77    We know of no other circumstances, apart from the unusual facts of *Anderson*, in which the pattern instructions were found to create a serious risk of confusing the jury. And at least three cases have held that there would be no such risk, even when there were multiple victims of the defendant's gunfire, because the evidence made clear that the defendant fired shots in the attempted-murder victim's direction.

¶ 78    In *Cavazos*, 2015 IL App (2d) 120171, ¶ 80, the murder and attempted-murder victims were walking side-by-side when the defendant opened fire in their direction. Similarly, in *People v. Salazar,* 2014 IL App (2d) 130047, ¶¶ 8, 59-65, the murder victim and two attempted-murder victims were shot when gunfire struck the car they were all riding in. And in *Malone*, 37 Ill. App. 3d at 187-88, the defendant first shot at a group of rival gang members, injuring one of them, and later shot at (but missed) the officer who came to arrest him. He was charged with attempted murder (of the civilian) and aggravated assault (of the officer), and the jury convicted him of both charges. *Id.* at 186-87. We held that the jury, in these circumstances, would have understood that the attempted-murder charge pertained to the civilian victim, and not the police officer, without any modification to the pattern instruction. *Id.* at 191.

¶ 79    Thus, in none of these cases was the pattern instruction's phrase "an individual" likely to mislead the jury into convicting the defendant of attempted murder based on a finding that he shot someone other than the actual victim of that offense.

¶ 80    We reach the same conclusion here. There is no question that defendant fired shots in Rivera's direction. Unlike in *Anderson*, where there was no evidence that Hazziez was the victim of a crime at all, Rivera was actually struck by defendant's gunfire. The evidence showed clearly

that defendant shot Escobar once, at point-blank range; he then turned his gun on Rivera, and shot him in the back while he was trying to flee. Worse yet, defendant continued to shoot Rivera after he fell to the ground, unable to move. That is strong evidence, we think, both that defendant specifically targeted Rivera (see *People v. Valadovinos*, 2014 IL App (1st) 130076, ¶¶ 30-36 (unlike *Anderson*, jury confusion would not arise where evidence showed defendant specifically targeted and aimed at attempted-murder victim)), and that defendant specifically intended to kill him. Escobar died from his wound; but Rivera lived to testify, to the shooting and his injuries, at defendant's trial.

¶ 81 Given this evidence, we are confident that the jury understood, perfectly well, that Rivera was the attempted-murder victim. And we are confident that the jury convicted defendant of that charge because it found that he shot Rivera with the specific intent to kill him. There were no unusual facts that required a modification of the IPI instructions. Because those instructions were not erroneous at all, defendant's plain-error and ineffective-assistance arguments fail.

¶ 82                                    CONCLUSION

¶ 83 For the foregoing reasons, we affirm defendant's convictions and sentence.

¶ 84 Affirmed.