2022 IL App (1st) 200714-U

SECOND DIVISION
December 20, 2022

No. 1-20-0714

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 12269 |
| | ) | |
| RANDY EDMONDSON, | ) | Honorable |
| | ) | Charles P. Burns, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Summary dismissal of post-conviction petition affirmed. Direct-appeal counsel was not arguably deficient for failing to raise alleged violation of confrontation clause. In addition to forfeiting claim, petitioner cannot show arguable prejudice from trial counsel's failure to request defense-of-another instruction.

¶ 2    Petitioner Randy Edmonson was convicted of the first-degree murder of Jose Escobar and the attempted murder of Alberto Rivera. In this appeal, from the summary dismissal of his post-conviction petition, he raises two issues of ineffective assistance of counsel. First, he contends that direct-appeal counsel was arguably ineffective for failing to raise an alleged violation of the Confrontation Clause, based on the State's use of witness Victoria Garza's prior testimonial statements at trial. Second, he contends that trial counsel was arguably ineffective for failing to request a jury instruction on defense of another. We affirm.

¶ 3                                    BACKGROUND

¶ 4      For a full account of the underlying crimes and trial evidence, see our decision affirming petitioner's convictions on direct appeal. *People v. Edmonson*, 2018 IL App (1st) 151381. We reproduce portions of that discussion here to provide the necessary background and context for resolving petitioner's post-conviction claims.

¶ 5      The victims, Jose Escobar and Alberto Rivera, were shot in front of Johnny O's, a hotdog stand at 35th and Morgan Streets, around 5:00 a.m. on September 30, 2012. Escobar was shot once in the face, from close range, and died on the scene from his gunshot wound. Rivera survived, but his injuries left him paralyzed and reliant on a wheelchair.

¶ 6      Rivera testified about the shooting and the events leading up to it. Rivera and Escobar left a party nearby and went to Johnny O's for a bite to eat. Rivera drank a few beers throughout the night and used cocaine at the party. Escobar was drunk. They were both Latin Kings.

¶ 7      The line in front of Johnny O's was a friendly scene. The customers chatted and mingled on the sidewalk while they waited for their food. Rivera, a car salesman, gave out his business card and tried to sell someone a car.

¶ 8      Petitioner and his friend, Rafael Diaz, walked up to the line. Rivera did not know either of them. Rivera first noticed them after Diaz and Escobar started arguing. Escobar was upset that Diaz wore his hat tilted to the right, which Escobar took as a sign of opposition or disrespect to the Latin Kings. Rivera tried to calm Escobar down. And so did petitioner, who repeatedly told Escobar, "we don't gang bang."

¶ 9      Julius Williams, another Johnny O's customer, testified that he arrived amid a heated and escalating dispute. Williams did not know any of the people involved, and he heard only "bits and pieces" of their argument. But he did recall Escobar asking petitioner and Diaz if they were

"Kings," and petitioner responding, "We don't gang bang."

¶ 10    At some point, Escobar took off his hoodie. Diaz motioned off to the side and said, "if you want to go, then let's go over here." Diaz stepped away from the line, and Escobar followed. Escobar shoved Diaz. The two squared off, with their fists raised, as if they were about to fight. But they never did.

¶ 11    Rivera testified that he tried to break them up. At first, petitioner did too. But then petitioner, who was standing somewhere behind Escobar, pulled a revolver out of his waistband; "swung around in front of" Escobar, put a gun "in his face," and shot him.

¶ 12    Rivera turned and ran, but he was shot from behind while trying to flee. Rivera fell to the ground and was shot two more times. He tried to move, but he could not feel his legs. In all, he suffered three gunshot wounds—to his back, shoulder, and left leg.

¶ 13    Williams testified that petitioner, who was standing off to the side of Escobar, walked up to Escobar and put a long-nose revolver to his head. The gun was "[r]eally close. Like, point-blank range." Williams immediately turned and ran. While he was fleeing, he heard a single gunshot, and then about four more gunshots fired in quick succession. Williams escaped safely and ran to his apartment nearby.

¶ 14    Neither Rivera nor Williams saw anyone at Johnny O's with a gun, or any other weapon, other than petitioner. Rivera also testified that he was unarmed.

¶ 15    The witnesses' accounts of the events leading up to the shooting were corroborated, in all essentials, by video footage from a Johnny O's surveillance camera. Rivera and Williams viewed and identified various clips, and the entire video was published to the jury.

¶ 16    Before petitioner and Diaz arrived, Rivera is seen mingling with the other customers for several minutes. Escobar is visibly drunk, often swaying and propping himself up against the

counter. Soon after petitioner and Diaz join the line, Escobar and Diaz begin to argue. Escobar repeatedly gets in Diaz's face, and both are evidently agitated. Most of the argument is inaudible, but at various points Escobar says to Diaz, "respect me ni\*\*\*." Rivera makes several efforts to calm Escobar down, and petitioner repeats, "we don't gang bang" numerous times.

¶ 17    After a few minutes, Diaz and Escobar step away from the counter. Escobar takes off his hoodie, and Diaz raises his fists in the air, as the two square off to fight. Escobar pushes Diaz, but otherwise the details of their confrontation are not evident on the video.

¶ 18    Meanwhile, petitioner and Rivera start walking over toward Diaz and Escobar. Along the way, petitioner, who had a phone in his right hand, appears to reach into his waistband with his left. A couple of seconds later, Williams turns and starts running. Someone yells "back up," and a single gunshot is audible. Rivera turns and runs, but as five more gunshots are fired in quick succession, Rivera falls to the ground.

¶ 19    Victoria Garza, petitioner's friend and Diaz's girlfriend, testified to the events that immediately followed the shooting. Garza and Diaz shared an apartment across the street from Johnny O's. In the wee hours, when Garza was drunk and getting ready for bed, Diaz went to Johnny O's. Beyond that, Garza's recollections were sparse: She heard a loud boom outside. Soon after that, petitioner came over, agitated and out of breath. Garza, Diaz, and petitioner drove toward Indiana on the Dan Ryan Expressway. Petitioner got out somewhere near the expressway, but Garza could not recall where. (The Danville Police Department arrested him on an unrelated matter, some nine months later and 140 miles from Chicago, and discovered an outstanding arrest warrant in this case.)

¶ 20    After claiming not to recall any further details of the evening, the State sought to impeach Garza with her grand-jury testimony and handwritten statement. It was the State's use of these

prior statements that, in petitioner's view, violated the Confrontation Clause. For the sake of economy, we reserve our discussion of Garza's prior statements and the trial court's rulings on their admissibility until we reach our analysis of petitioner's confrontation claim.

¶ 21    At petitioner's request, and over the State's objection, the trial court instructed the jury on self-defense, with respect to both charged offenses; and on the mitigated offense of second-degree murder, based on petitioner's unreasonable belief that self-defense was necessary. The trial court found that there was a basis in the evidence for self-defense and second-degree-murder instructions, because there "appear[ed] to be some contact between Mr. Diaz and Mr. Escobar immediately prior to the shooting." Defense counsel did not request an instruction on defense of another.

¶ 22    Petitioner later filed the post-conviction petition at issue here, which the circuit court summarily dismissed. For reasons it did not explain, the circuit court "decline[d] to deem 'patently erroneous' appellate counsel's assessment of the record and decision not to raise" the confrontation issue (and others no longer relevant). As for petitioner's claim that trial counsel was ineffective for failing to request a defense-of-another instruction, the circuit court held that the claim was forfeited because it could have been, but was not, raised on direct appeal.

¶ 23                                ANALYSIS

¶ 24                                    I

¶ 25    We begin with the confrontation clause issue.  In her written statement and grand-jury testimony, Garza said, among other things, that during the car ride toward Indiana, Diaz asked petitioner why he shot Escobar in the head; in response, petitioner sobbed and said that he "wasn't going to County" and that he "wanted to kill himself." At trial, Garza claimed that she did not remember saying these things (though she did not deny saying them, either). For ease of

reference, we will refer to these specific prior statements, recounting the conversation between Diaz and petitioner during the car ride toward Indiana, as the "disputed statements."

¶ 26    As petitioner reads the record, the trial court allowed the State to introduce the disputed statements as substantive evidence—even though, in petitioner's view, Garza's claimed memory loss rendered her effectively "unavailable" for cross-examination. Petitioner thus contends that the use of the disputed statements violated the Confrontation Clause, and that direct-appeal counsel was ineffective for failing to raise this issue.

¶ 27    At the first stage, petitioner must show that direct-appeal counsel was arguably deficient in failing to raise this issue, and that he was arguably prejudiced by that failure on direct appeal. *People v. Petrenko*, 237 Ill. 2d 490, 496-97 (2010); see *Strickland v. Washington*, 466 U.S. 668 (1984). Our review is *de novo*. *Petrenko*, 237 Ill. 2d at 496.

¶ 28                                        A

¶ 29    We begin with a threshold problem for petitioner's claim: the disputed statements were not admitted into evidence, for any purpose. Thus, the claim has no basis in the record.

¶ 30    During the State's direct examination, Garza's memory of the night in question began to falter—or so she claimed, at least. So the State asked if she remembered being interviewed at the police station by Assistant State's Attorney (ASA) Holly Kremin and giving a written statement at that time. In due course, the State would also ask Garza similar questions about her grand-jury testimony and preparation for that proceeding with ASA Latoya Croswell.

¶ 31    Apparently aware that Garza would claim not to remember these (and other) details of her written statements and grand-jury testimony, defense counsel objected that this entire line of questioning was "not impeaching." The trial court allowed the State to proceed, over objection, at least for the purpose of impeaching Garza. The court also noted that the State might be seeking

to lay a "foundation" for the "substantive" use of her prior inconsistent statements.

¶ 32    Garza went on to acknowledge that she gave a written statement at the police station and testified before the grand jury. But she claimed that, by and large, she did not remember *what* she said. And she specifically claimed that she did not remember making the disputed statements.

¶ 33    Before the State called ASAs Kremin and Croswell to the stand, to prove up the content of Garza's written statement and grand-jury testimony, the trial court ruled that the disputed statements were not admissible as substantive evidence under section 115-10.1 of the Code of Criminal Procedure. See 725 ILCS 5/115-10.1 (West 2020). In light of that ruling, ASAs Kremin and Croswell did not prove up the disputed statements, and the State never perfected its intended impeachment of Garza with those statements. Indeed, the ASAs did not testify that Garza ever said anything at all about any conversation between Diaz and petitioner in the car. All that they proved up (apart from some other unrelated and frankly unimportant matters of impeachment) was Garza's statement that petitioner said "get me out of here" when he arrived at the apartment, which the trial court admitted as substantive evidence, and which is not at issue in petitioner's confrontation claim.

¶ 34    In short, the jury was not offered any proof that Garza ever made the disputed statements. What the jury actually heard was the *question*, put to Garza, whether she recalled making those statements; Garza's testimony that she had no such recollection; and evidence that Garza made a *different* statement on the two prior occasions in question. Simply put, the disputed statements were not in evidence. Hence, direct-appeal counsel had no basis for raising this issue. For this reason alone, petitioner cannot establish that direct-appeal counsel was arguably ineffective.

¶ 35                                                                    B

¶ 36    We should acknowledge that part of the confusion on this point was of our own making.

In our previous opinion on this matter, written by the same author of this Order, we wrote that Garza was impeached with her prior inconsistent statements after she claimed that her memory had faltered. *Edmondson*, 2018 IL App (1st) 151381, ¶ 21. As we have just explained, that is not accurate. It would have been more accurate to have said there what we say above—that the State asked Garza if she made those inconsistent statements, she said she did not recall, and then the State *sought* to impeach Garza with the disputed statements but was not permitted to do so. Thus, the statements were never proved and were not in evidence for any purpose.[1]

¶ 37                                                              C

¶ 38    In any event, even if petitioner were correct that the mere *mention* of these statements by petitioner put in the form of questions to Garza, without ever being proved up, were enough to jump-start a confrontation claim, the claim would fail for another reason—Garza's claimed memory loss did not arguably deny petitioner an opportunity for effective cross-examination. Otherwise put, it did not render Garza "unavailable" for cross-examination.

¶ 39    An out-of-court testimonial statement may be admitted as substantive evidence only if the declarant is available for cross-examination at trial or, if not, the defense had a prior opportunity to cross-examine the declarant about the statement. *Crawford v. Washington*, 541 U.S. 36, 68

---

[1] We should further note that this misstatement did not contribute in any meaningful way to the outcome of that direct appeal. We did reference petitioner's statement to Garza that "he feared going to 'county' " (*id.* ¶ 58) in the context of a broader and lengthy discussion about whether it was ineffective for trial counsel to fail to argue theories of self-defense and second-degree murder to the jury in closing argument. The fact that petitioner made that statement to Garza, but never mentioned being in fear of his life, was one of multiple reasons why defense counsel could have reasonably decided not to argue those theories to the jury, even though the jury was given instructions on those theories. It was by no means the only reason and not nearly the most decisive one. See *id.* ¶ 30-59. While we regret the misstatement of the record, it played no meaningful role whatsoever in the outcome of the direct appeal.

(2004). It is true, as petitioner says, that a witness who takes the stand may still be "unavailable" for cross-examination; at some point, the witness's inability or refusal to answer questions may deny the defense its constitutionally guaranteed "opportunity for effective cross-examination." See *United States v. Owens*, 484 U.S. 554, 559 (1988).

¶ 40     But a witness who takes the stand at trial is "unavailable" only when she is completely, or almost completely, unable or unwilling to answer questions, as two of petitioner's own principal citations illustrate. In *In re Rolandis G.*, 232 Ill. 2d 13, 18 (2008), the witness-victim "answered a few preliminary questions about himself" and identified the defendant as someone he knew from the neighborhood, but "when asked about the events" in question, he "resolutely refused to respond" and "could not bring himself to answer questions about the allegations." Similarly, in *In re Brandon P.*, 2014 IL 116653, ¶¶ 14-16, 47, the witness-victim "could barely answer the trial court's preliminary questions [at the bench trial], and then completely froze when the State attempted to begin its direct examination of her." In short, neither witness could answer any substantive questions at all, either about the underlying offenses or their prior testimonial statements that were admitted into evidence.

¶ 41     The logical corollary of this point is that a witness does not need to be able to answer every question posed to the defense's satisfaction in order to be deemed "available" for cross-examination. "The Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Citations omitted.) *Owens*, 484 U.S. at 559.

¶ 42     And in particular, "a gap in the witness's recollection concerning the content of a prior statement does not necessarily preclude an opportunity for effective cross-examination." *People v. Flores*, 128 Ill. 2d 66, 88 (1989). In *Flores*, our supreme court held that the confrontation

clause permitted the State to introduce a witness's grand-jury testimony as substantive evidence after he claimed at trial that he could not remember its content. *Id.* at 87-90. Similarly, in *People v. Martin*, 408 Ill. App. 3d 891, 895-97 (2011), we held that the confrontation clause permitted the State to introduce a written statement that the witness claimed not to remember at trial. The same conclusions would apply to Garza's written statement and grand-jury testimony, had they been admitted into evidence.

¶ 43    To the extent that *People v. Yarbrough*, 166 Ill. App. 3d 825, 831 (1988), cited here by petitioner, stands for the general proposition that effective cross-examination is impossible when a witness claims not to remember an out-of-court statement, we would note, as we have before, that *Yarbrough* preceded both *Flores* and *Owens*. See *People v. Hampton*, 387 Ill. App. 3d 206, 213 (2008); *People v. Tracewski*, 399 Ill. App. 3d 1160, 1168 (2010) (Steigmann, J., specially concurring). So at the very least, *Yarbrough* should no longer be cited as good law.

¶ 44    The fact that a witness has a poor memory, and is to this extent unreliable, is "often the very result sought to be produced by cross-examination, and can be effective in destroying the force of the prior statement." *Flores*, 128 Ill. 2d at 90 (quoting *Owens*, 484 U.S. at 562). The record here exemplifies this point. Defense counsel cross-examined Garza before the trial court ruled on the admissibility of the disputed statements and other aspects of her written statement and grand-jury testimony. Counsel thus had ample motivation to explore the circumstances of those statements and challenge their credibility and reliability. And to this end, counsel's cross-examination of Garza was in many ways effective.

¶ 45    For one, Garza testified on cross-examination that she was "pretty drunk" by the time the events unfolded at Johnny O's, at 4:00 in the morning, since she drank "10 to 15 drinks, shots" and smoked cannabis earlier that night. With this testimony, counsel sought to cast doubt on

Garza's ability to remember the events of that evening and, in turn, on the reliability of any statements she later made about them.

¶ 46    Defense counsel also elicited testimony from Garza that, if believed by the jury, would have significantly diminished whatever force her grand-jury testimony otherwise would have had. See *id.* As Garza explained, she had to review her written statement about four times with ASA Croswell before testifying to the grand jury because, even by then, she "didn't remember" anything she had previously said about the night of the shootings. In fact, Garza only knew what to say to the grand jury because she was "reading it off the paper." Defense counsel thus made the case that her grand-jury testimony had no independent evidentiary value.

¶ 47    Beyond that, defense counsel brought out that Diaz was Garza's boyfriend at the time, the father of her child, and her principal means of financial support. A few days after the shootings, Garza dropped Diaz off at the police station. Later that day, she gave her own written statement to ASA Kremin at the station. Defense counsel's theory, as articulated during a sidebar, was that Garza had a clear motive to implicate petitioner in her written statement: to protect Diaz, "her man." Many of the elements of this theory were successfully elicited in cross-examination and later highlighted in closing argument. Some other elements—that Garza supposedly knew Diaz was being charged in connection with the shootings, and that Diaz was on bond at the time, on a pending federal charge—were never brought out. But that was because the trial court did not permit counsel to cross-examine Garza on these topics. It was not the result of Garza's claimed memory loss.

¶ 48    All in all, Garza's claimed memory loss did not deprive the defense of an opportunity for meaningful cross-examination. Direct-appeal counsel was not arguably deficient for failing to raise this alleged violation of the confrontation clause.

¶ 49                                                    II

¶ 50     The jury was instructed on *self*-defense (with respect to the murder of Escobar and the attempted murder of Rivera) and imperfect *self*-defense (with respect to the murder charge). But the jury was not instructed on perfect or imperfect defense of *another*—in particular, defense of Diaz—with respect to either charge. See 720 ILCS 5/7-1(a); Illinois Pattern Jury Instructions (IPI), Criminal No. 24-25.06 (4th ed.). Thus, the jury had no option to acquit petitioner, or to mitigate the first-degree murder charge, on the ground that he was responding (reasonably or unreasonably) to a perceived threat that Escobar posed to *Diaz*, as opposed to petitioner himself. Petitioner alleges that trial counsel was ineffective for failing to request these defense-of-another instructions.

¶ 51     For two independent reasons, the trial court correctly dismissed this claim. The first is that this argument is forfeited, as petitioner's claim is based entirely on the trial record, and thus he could have raised it on direct appeal but did not.

¶ 52     In Illinois, many *Strickland* claims made against trial counsel involve matters that require the development of a factual record beyond the record on appeal—for example, something trial counsel said privately to the defendant, or trial counsel's failure to pursue certain evidence or witnesses. When raised on direct appeal, we thus decline to consider those claims for that very reason and urge defendants to file a postconviction petition, where they can develop the appropriate record. See *People v. Veach*, 2017 IL 120649, ¶ 46. But if the *Strickland* claim is based entirely on the trial record, the appellate court is in perfect position to review it, and thus it must be raised on direct appeal or be forfeited. *Id.* ¶ 47.

¶ 53     Here, petitioner presents no new evidence, outside the trial record, that he could not have presented on direct appeal. Certainly, as to the first prong of a *Strickland* claim—deficient

representation—the trial record would have been more than enough for our review on direct appeal. The trial court had already allowed petitioner to submit defense theories of self-defense and unreasonable self-defense/second-degree murder. It would have cost petitioner nothing to also add the theory that, beyond defending *himself*, he was alternatively trying to protect *Diaz* from attack. It would have been a simple matter of requesting that the justification instruction include a reference to Diaz alongside the reference to petitioner. See IPI (Criminal) 4th No. 24-25.06 ("A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend *[(himself) (another)]* against the imminent use of unlawful force.") (Italics in original.)

¶ 54    And the trial court almost surely would have allowed that instruction; it allowed the self-defense and unreasonable self-defense instructions because there "appear[ed] to be some contact *between Mr. Diaz and Mr. Escobar* immediately prior to the shooting." If that was the evidentiary basis for submitting the issue of justification (and mitigation) to the jury, then a defense-of-another instruction actually made more sense than a self-defense instruction.

¶ 55    And though the State here argues that counsel's decision not to seek that instruction was unreviewable trial strategy, an argument that is typically inappropriate for the first stage (see *People v. Tate*, 2012 IL 12214, ¶¶ 18-22), this is the rare case where the record is sufficient to resolve that question—but in petitioner's favor. Again, there is no possible strategic reason why trial counsel should not have requested the defense-of-another instructions. They went part-and-parcel with his instructions on self-defense and would have given the jury additional bases for acquittal.

¶ 56    And as to prejudice, the second prong of a *Strickland* claim, the record on appeal likewise would have been all we would have needed on direct appeal. It would be a simple matter of

reviewing the strength of the overall evidence against petitioner and the viability of a defense-of-another theory in light of that evidence to determine whether the absence of those jury instructions likely would have led to a different outcome.

¶ 57    All of this is merely to say that the record on appeal alone was sufficient to consider this *Strickland* claim against trial counsel. And thus petitioner was required to raise it on direct appeal on pain of forfeiture. To pursue that claim in a postconviction petition, petitioner would have been required to attack the effectiveness of *direct-appeal* counsel for failing to raise it. See, *e.g.*, *Petrenko*, 237 Ill. 2d at 499; *People v. Patterson*, 192 Ill. 2d 93, 120 (2000); *People v. Williams*, 209 Ill. 2d 227, 233 (2004). He makes no such allegation. When a post-conviction claim of ineffective assistance of trial counsel is "based on the record" and "not raised on direct appeal," and the petitioner "does not allege ineffective assistance of appellate counsel," he forfeits review of the issue, and the claim may be summarily dismissed on this basis. See, *e.g.*, *People v. Youngblood*, 389 Ill. App. 3d 209, 214 (2009). We are bound to reach that conclusion here.

¶ 58    Lest petitioner feel as if a valid *Strickland* claim was lost via forfeiture, we should be clear that the claim was not, in fact, valid. While petitioner may have been able to establish deficient performance for trial counsel's failure to request defense-of-another instructions, we have no hesitation in finding that petitioner could not have established the second *Strickland* prong, prejudice. He could not show or even arguably show that the verdict would have been different had the defense-of-another instructions been given.

¶ 59    It is one thing for a trial court to err on the side of submitting a factual question to the jury, by granting an instruction that is just barely warranted, if at all, by the evidence. But it is quite another for an appellant to establish *Strickland* prejudice, or even an arguable claim of

*Strickland* prejudice. And defense-of-another was an extremely weak defense to any charge, even if (as the trial court's ruling would seem to reflect) it made somewhat more sense than a theory of self-defense.

¶ 60 Take the attempted murder of Rivera. For petitioner to prevail on a justification defense, whether defense of another or self-defense, petitioner's belief that defensive force was necessary had to be not just sincere but *reasonable* under the circumstances. See *People v. Taylor*, 2016 IL App (1st) 141251, ¶ 11; *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995); 720 ILCS 5/7-1(a) (West 2020). But as we explained on direct appeal, "[i]t is beyond dispute that Rivera never posed any threat to [petitioner] (*or anyone else*)." (Emphasis added.) *Edmonson*, 2018 IL App (1st) 151381, ¶ 54. Before the shooting, Rivera mingled jovially with the other customers. When Escobar and Diaz started having words, Rivera tried to calm his friend down. He never threatened anyone, not even verbally. Yet when Rivera fled, after petitioner shot Escobar, petitioner turned his gun on Rivera and shot an unarmed man in the back. After Rivera fell to the ground, unable to move, petitioner kept shooting him. This was indisputably *not* a reasonable or justified use of deadly force. *Id.* ¶¶ 54-55. And that point stands, no matter who petitioner might try to claim he was "defending."

¶ 61 The same is true with respect to the first-degree murder of Escobar. To acquit petitioner on a defense-of-another theory, the jury would have to find that it was objectively reasonable to use deadly force in defense of Diaz at that moment—when a drunken, wobbly Escobar, who could barely hold himself up at times, who had no visible weapon and was plainly not reaching for one (as his hands were in the air), appeared to be squaring off for nothing worse than a fist-fight with Diaz. These circumstances do not provide an objectively reasonable justification for shooting Escobar in the face. Not even arguably.

- 15 -

¶ 62    Granted, a claim that petitioner was defending *Diaz* from Escobar gets slightly more traction than a claim that he was defending *himself* from Escobar. As petitioner notes, selectively excerpting our decision on direct appeal, Escobar's "belligerence was directed at Diaz," as was "any physical threat that Escobar may have posed." *Id.* ¶ 50.

¶ 63    But then again, Escobar's drunken "belligerence" was "almost purely verbal," and any "physical threat" he may have posed to Diaz "was minimal to boot." *Id.* In particular, "Escobar shoved Diaz once, and then squared off against Diaz for a fistfight. But it never even came to blows between Escobar and Diaz," since petitioner walked over at that point and shot Escobar. *Id.* So while we did make the point that self-defense was an *even weaker* theory than defense-of-another—in the course of explaining why counsel could have reasonably taken a pass on arguing self-defense to the jury—we never meant to suggest that a defense-of-another claim had some meaningful prospect of victory. The facts show that petitioner's use of deadly force against Escobar was not even arguably justified, on either theory of justification.

¶ 64    That leaves second-degree murder. A defense-of-another instruction would have allowed the jury to find this mitigated offense based on a sincere, albeit unreasonable, belief that Escobar posed an imminent threat to Diaz's life. See 720 ILCS 5/9-2(a)(2) (West 2020); *Jeffries*, 164 Ill. 2d at 113. As we previously explained, there was little, if any, evidence that petitioner sincerely perceived Escobar as an imminent threat to his own life. And there is not much more to be said for a claim that he perceived Escobar as an imminent threat to Diaz's life.

¶ 65    For one, the objective circumstances do not support an inference that petitioner genuinely feared for Diaz's life. There was no evidence that petitioner harbored the belief, reasonable or otherwise, that Diaz's life was at risk—no utterance, gesture, or expression from petitioner on that video. And it bears emphasis that the defense bore the burden on this question at trial. 720

ILCS 5/9-2(c) (West 2020).

¶ 66 Ultimately, petitioner's supposed belief that Diaz's life was in imminent danger would have to be inferred from a drunken, unarmed Escobar's apparent readiness for a fistfight with Diaz. True, Escobar was also an agitated gang member who felt disrespected by Diaz's crooked hat. Of course, it is *conceivable* that petitioner thus grew fearful of deadly violence toward Diaz. See *Edmonson*, 2018 IL App (1st) 151381, ¶ 57. But beyond that, there was really nothing to suggest that petitioner genuinely feared for Diaz's, or anyone else's, life. And the jury would still have to accept that petitioner, believing Escobar to be a mortal threat, deliberately walked over to him and put himself directly in the line of danger. See *id.* ¶ 58.

¶ 67 So while the evidence may been minimally sufficient to warrant a jury instruction, by no means do we find any merit to any claim of defense of another in any form. Petitioner was not arguably prejudiced by trial counsel's failure to request instructions on defense of another.

¶ 68                                    CONCLUSION

¶ 69 For these reasons, we affirm the judgment of the circuit court.

¶ 70 Affirmed.