2021 IL App (2d) 190575-U
No. 2-19-0575
Order filed October 29, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-269 |
| DAVID ACEVEDO, | ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Presiding Justice Bridges and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for first-degree murder is affirmed.

¶ 2    The State charged defendant, David Acevedo, age 22, with five counts of first-degree murder.   720 ILCS 5/9-1(a)(1), (2) (West 2014).   It alleged that defendant, without legal justification, stabbed Andrew Erickson with a knife with an intent to kill (count I), an intent to do great bodily harm (count II), knowing such act would cause death (count III), knowing such act created a strong probability of death (count IV), and knowing such act created a strong probability of bodily harm (count V).  The case proceeded to a bench trial.  Defense counsel presented a theory

of self-defense, but defendant himself testified that the stabbing was accidental. The trial court rejected defendant's self-defense theory, and it expressly found defendant to lack credibility. It convicted defendant on counts II, III, IV, and V for first-degree murder and sentenced defendant to 45 years' imprisonment. On appeal, defendant argues that the State failed to prove that he did not act in self-defense and, alternatively, that his first-degree murder convictions should be reduced to involuntary manslaughter. 720 ILCS 5/9-3 (West 2014). We reject defendant's arguments and affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The parties agree to certain background information. That is, at approximately 4 a.m. on September 11, 2015, defendant stabbed Erickson in the street of a residential neighborhood in Plano following an altercation over missing cigarettes and a missing cell phone. Before that, beginning in the late evening hours of September 10, 2015, defendant's group (consisting of Christopher and Rashunae Negre, who were brother and sister, as well as Michael Quiros) and Erickson's group (consisting of his girlfriend, Felicia Santana, his best friend, Chase Malloe, and Malloe's girlfriend, Monique Christy) had socialized together at two different bars and two different apartments. The second apartment belonged to Erickson. Members of each group drank beer throughout the evening, with Erickson's blood alcohol level later determined to be .087. The groups overlapped in that the Negre siblings were also friends with members of Erickson's group, Erickson and defendant had been at some of the same parties in the past, and Christy was the maternal grandmother of defendant's son.

¶ 5      According to the State's theory of the case, when defendant's group left Erickson's apartment, Erickson's group noticed that Erickson's cigarettes and Santana's cell phone were missing. Erickson's group believed that someone in defendant's group had stolen them.

Erickson's group drove two separate cars to the subdivision where Christy, the Negre siblings, and defendant all lived. Erickson's group arrived to find defendant's group (except Quiros, who had gone home for the evening) sitting in the Negres' car in front of the Negres' home, which was owned by their mother. Erickson and Malloe got out to speak with them. Santana and Christy stayed in their cars. Rashunae Negre asked if they could "take it down the street" so as not to disturb her mother, which they did. A civil conversation quickly turned confrontational. Defendant struck first, hitting Erickson in the head with a glass beer bottle. A fistfight broke out between the two, with Malloe and the Negres attempting to break it up. Defendant, who knew Erickson and Malloe to be unarmed, eventually stabbed Erickson twice and attempted to stab Malloe before fleeing to his home. The fatal stab wound was the result of a forward thrust that cut through two ribs and pierced Erickson's heart. The second stab wound penetrated Erickson's stomach area.

¶ 6    According to defendant's theory of the case, Erickson and Malloe sought out a fight with defendant. Erickson and Malloe changed out of their dress shirts and into more comfortable clothing before going to find defendant; they asked their girlfriends to drive get-away cars. Upon reaching defendant's subdivision, they aggressively questioned defendant about the cell phone and Malloe threw the first punch. Erickson and Malloe pummeled defendant, even kicking him on the head while he was on the ground. At that point, the Negres interceded and pulled Erickson and Malloe off defendant. Defendant began to walk away, but Erickson and Malloe came after him again, yanking his sweatshirt over his head, spinning him around, and continuing to punch. Erickson had also taken off his shirt in preparation for more fighting, saying, "someone is going to get f**d up." Erickson and Malloe continued to punch defendant. His nose was bleeding, and he feared for his life. Defendant got away a second time but, when he was six or seven feet away

from Erickson, he remembered that he had a knife in the pocket of his pants. Defendant drew the knife and turned around. He told Erickson and Malloe to back away. His intent was to scare them. He swung the knife wildly in all directions and Erickson walked into it. At that point, the knife fell out of defendant's hands and defendant, who continued to fear Erickson and Malloe, ran home. Defendant did not intend to stab Erickson and did not realize that he had stabbed Erickson until he was charged with first-degree murder.

¶ 7    At trial, the State called two occurrence witnesses: Santana and Malloe. Additionally, Dr. Amanda Youmans, who performed the autopsy, and several investigating officers testified. Neither Christy nor the Negre siblings testified. Defendant was the sole witness for the defense.

¶ 8                                    A. Felicia Santana

¶ 9    Santana testified that, when her group left Erickson's apartment, she was tired and wanted to stay behind. Nevertheless, she went along with the group. Christy drove the first car with Malloe as a passenger and Santana followed behind Christy with Erickson as a passenger. It was not clear to Santana that they were going to retrieve her cell phone. She thought they were going to Christy's house, because they were headed toward Christy's subdivision. Christy pulled into the subdivision and stopped her car. Santana stopped her car behind Christy.

¶ 10    Erickson and Malloe got out of the cars and approached defendant's group. Santana and Christy remained in their cars. Santana's window was partially down, and she could hear talking but she could not make out the words. The tone was "regular voice talking." At some point, tensions escalated, and people started yelling and shouting. Still, she could not make out the words and she could not hear which individuals were shouting. Santana saw certain individuals begin to "brawl." She could not see which individuals were fighting, but she "just knew that the males were together and fighting." Erickson was "somewhere in there."

¶ 11    Santana moved her car alongside Christy's, hoping to disburse the men. She was unsuccessful. She began to feel "intimidated by the fight" and moved her car to the front of the line, in front of the Negres' car. She denied that she moved her car to the front of the line to make for a quicker getaway: "That wasn't my thought at the time."

¶ 12    Santana continued to watch the fight by looking in her rearview mirror, but the Negres' car blocked her view "a little bit." The men moved onto the sidewalk, near the parked cars. Erickson was walking backward toward her car. Santana called for him to get into the car. He did not. The men moved back into the street, between the Negres' and Christy's car. Erickson walked forward at this point. When Erickson was between the cars, Santana heard Erickson scream in pain. Erickson collapsed to the ground.

¶ 13    Santana got out of the car and covered Erickson's wound with her hands to try to stop the bleeding. He was not wearing a shirt. Her hands were slipping because there was so much blood. She removed her own shirt and used it to try to stop the bleeding. Malloe helped her. She began performing CPR and Erickson vomited. She continued to perform CPR until the police and paramedics arrived.

¶ 14    When the police arrived, Erickson's group and Christopher Negre remained at the scene. Defendant and Rashunae Negre had left. The Negres' car was gone. Santana was taken immediately to the police station for an interview. The police found Santana's phone "down the street" from where the fight occurred. Santana did not place her phone there.

¶ 15    On cross-examination, Santana agreed that it was dark that night and there were no streetlights. Still, she could see that Malloe was near Erickson during the entire fight. She did not see anyone holding or swinging a glass bottle. Defendant impeached Santana on two points. Although Santana testified that she stopped her car when Christy stopped her car, Santana told

police that Erickson told her to stop the car. Also, although Santana testified that she could not discern who was yelling, Santana told police that she heard Erickson yell at defendant.

¶ 16                                    B. Chase Malloe

¶ 17     Malloe testified to his criminal history and size. He had been convicted of obstructing identification, theft, and failure to report a change of address. He was 6 feet, 250 pounds.

¶ 18     Malloe then testified to the events leading up to the fight. He testified that, while at Erickson's apartment, they changed out of their dress shirts and into more comfortable clothing. They drove to defendant's subdivision because Christy lived there and she wanted to go home. When Christy pulled into her subdivision, Malloe saw defendant's group sitting in the Negres' car alongside the road. Malloe did not know that the Negres lived in Christy's subdivision. Malloe exited the car and approached the Negres' car. Malloe asked defendant's group whether they had Santana's cell phone. Rashunae responded by asking if they could "move up the street." Malloe got back in Christy's car and they followed the Negres' car down the street near a cul-de-sac. Christy parked along the right side of the road, 10 feet behind the Negres' car. Santana and Erickson arrived and parked behind Christy. Malloe and Erickson got out of their cars and approached defendant's group, which now included just defendant and the Negres. The group had a discussion in the 10 feet of space between Christy's and the Negres' cars. Erickson looked at Rashunae and said, "I trust you, I know you wouldn't take it." Erickson then looked at Christopher and said, "I trust you, I know you wouldn't take it." Finally, Erickson looked at defendant and said, "I don't know you and I don't trust you." Defendant responded by swinging a glass beer bottle at Erickson's head. The bottle hit Erickson on the left side of the head. After defendant struck Erickson with a bottle, a fight broke out. Malloe clarified that Erickson said nothing more threatening to defendant than that he did not trust him. Erickson had not displayed a weapon.

¶ 19     Initially, the fight was between Erickson and defendant. The fight moved into the parkway and then back into the street. At some point, Malloe, Rashunae, and Christopher entered the fight to try to break it up. However, Erickson and defendant continued to fight in the parkway. Malloe returned to Christy's car to talk to her. He saw Erickson "come out of his shirt," and then defendant lunged at Erickson. Malloe saw defendant's right hand touch Erickson's body. Erickson yelled that he got stabbed. He turned toward Malloe and put his right hand over his left chest. Erickson came toward Malloe and fell near the driver's side of Christy's car, where Malloe had been standing. Malloe was in shock. Malloe looked down at Erickson. Then, "just in time," Malloe looked up and saw defendant "jumping over [Erickson]" with a knife in his hand. Defendant swung the knife at Malloe. The knife came within inches of Malloe's face. Malloe ducked, turned around, and ran around the back of Christy's car. Malloe then saw defendant run away toward Rashunae's house. He no longer saw Rashunae. Christopher remained on the scene.

¶ 20     Once Malloe saw that defendant was gone, he ran to Erickson's side. He called out to Santana and Christy to help. Santana took off her shirt to try to stop the bleeding. No one in the group had a cell phone, so Christy knocked on doors to find someone to call 9-1-1. Neighbors came outside to help.

¶ 21     When the police arrived on the scene, Malloe told them that defendant stabbed Erickson. During a 6:30 a.m. interview at the police station, Malloe again told police that defendant stabbed Erickson and tried to stab him as well. He also told police that defendant hit Erickson with a glass beer bottle.

¶ 22     During cross-examination, Malloe testified that, back at Erickson's apartment, Christy was uncomfortable with defendant's presence. Defendant was the father of Christy's grandson. Malloe, therefore, spent his time talking with Christy rather than the others.

¶ 23    Malloe returned to the topic of the glass bottle. Malloe could not recall whether the bottle was green or brown. The bottle did not break when it hit Erickson. Malloe did not know where it fell. Malloe told the police about the bottle. He did not recall telling the police that he began hitting defendant when defendant hit Erickson with the bottle. Rather, he recalled that he tried to break up the fight when defendant hit Erickson with the bottle and, when defendant hit him, he swung back.

¶ 24    Malloe did not recall defendant ever falling to the ground. He "definitely" did not recall kicking defendant while defendant was on the ground. Malloe acknowledged that, at some point, defendant retreated to the parkway and Erickson pursued defendant. At that point, defendant stabbed Erickson.

¶ 25    The defense impeached Malloe on several points. Although Malloe testified that defendant tried to stab him when he was standing over Erickson in shock, Malloe told police that defendant tried to stab him as he was helping Erickson. Although Malloe testified that the knife was three to five inches long, Malloe told police that he did not see the weapon. Malloe then clarified that he meant he had not seen the weapon before the stabbing.

¶ 26                                    C. Defendant

¶ 27    Defendant testified about the events leading up to the fight. After defendant's group left Erickson's apartment, they headed to the Negres' house. Defendant lived one-half mile from that residence. He was planning to visit with the Negres before returning home. While parked in front of the Negres' house, he heard a screech. Two cars had parked behind the Negres' car. Erickson and Malloe exited from the two vehicles. Erickson and Malloe were of similar sizes to defendant, who was 5 feet, 10 inches or 5 feet, 11 inches and 235 pounds (or slightly lighter).

¶ 28    Erickson and Malloe were "loud," "belligerent," and "obnoxious" from the beginning. Defendant could not understand what they were saying. Because of their tone, Rashunae asked Erickson and Malloe to follow them further down the street, so that her mother would not hear them.

¶ 29    Once down the street, defendant, Rashunae, and Christopher exited the vehicle. Erickson and Malloe exited their vehicles. Defendant recalled that Erickson said "something about I trust you ***[.] And I trust you guys, but I don't trust [defendant]." Malloe asked "where is the cigarettes, where's the phone[?]" Defendant responded by saying that he did not smoke cigarettes and the only phone he had was his own. Defendant took his phone out of his hoodie sweatshirt. Defendant did not have a glass bottle and he did not hit Erickson across the head with a glass bottle.

¶ 30    When defendant took out his phone, Erickson snatched it and Malloe hit him. Erickson took his shirt off and stated: "somebody is going to get f**d up." Erickson hit him, delivering three blows. At that point, defendant fell to the ground. Erickson and Malloe continued to strike defendant while he was on the ground. They kicked him on the forehead. Defendant put his arms near his head for protection and tried to keep his head from hitting the concrete. Defendant was on the ground for approximately 20 seconds when the Negres came to his aid. The Negres pulled defendant to the side and held back Erickson and Malloe.

¶ 31    After the Negres interceded on defendant's behalf, defendant began to walk away toward the Negres' vehicle. At that point, either Erickson or Malloe struck defendant on the back of the head. Erickson and Malloe pulled defendant's sweatshirt over his head. They continued to strike him and showed no sign of stopping. Defendant's nose began to bleed. Defendant felt pain. Defendant testified: "I thought these guys were going to beat me to death." Defendant tried to get

away to the Negres' house. However, at that point, he realized he had a knife in the pocket of his pants. He stopped and turned around. He saw Erickson coming toward him. Erickson was about six or seven feet away. Defendant pulled out the knife.

¶ 32    Defendant described the stabbing:

"A. *** I just swung my knife and told him to back up.

Q. Okay. And what did he do?

A. Continued to come toward me.

Q. And approximately how long is this taking?

A. Approximately, a few seconds.

Q. Okay. And do you know if you hit him with the knife.

A. No. I did not.

Q. You did not know or you did not hit him?

A. I swung. I just swung. I didn't realize I made contact.

Q. Okay. And what happened at that point?

A. At that point it fell from my hand.

Q. Are you talking about the knife?

A. Yeah.

Q. Okay. And what happened with [Erickson]? Did he stop coming towards you?

A. Yes, he did.

Q. What did you do?

A. I ran [toward the Negres' house].

***

Q. Okay. When you are running, did you ever swing the knife at Chase Malloe?

A. During the altercation I might have.

Q. Okay. Well, I'm talking about—so was [Malloe] also near [Erickson] while you're swinging the knife?

A. Yes, he was.

Q. Okay. And he was also coming towards you?

A. Yes, he was.

Q. Okay. But after that, you did not have the knife to swing, is that correct?

A. No. I didn't.

Q. Was [Erickson] still upright when you ran off?

A. Yes, he was."

¶ 33 Defendant went home to his mother's house. His head was pounding. He drank some water. He was in shock. He was still bleeding and he washed himself in the upstairs bathroom. He had left his cell phone at the scene and he was not certain whether his mother had a landline. In any event, he did not want to call the police, because he did not want any further involvement with Erickson and Malloe. Defendant went to sleep within 15 minutes of arriving home and was awakened shortly thereafter by the police. He was arrested and brought in for questioning.

¶ 34 During cross-examination, defendant acknowledged that his own injuries were relatively minor. He did not suffer any broken bones. He did not require stitches or even a large bandage. Defendant also acknowledged that he believed Erickson and Malloe to be unarmed. He explained why he nevertheless drew his knife:

"Q. *** Was there anything that prevented you from turning and running away [instead of pulling out the knife]?

A. At that point I felt like my life was in danger.

Q. Okay.

A. So I just swung the knife.

Q. So you took the knife out because you believed you needed to stab them in order to protect yourself[.] [T]hat's what you're saying?

A. I took the knife out to swing for them to back away from me.

Q. The same two people that don't have a weapon, right?

A. Correct.

Q. Were your friends still sitting or standing fairly close by?

***

A. Correct."

¶ 35    Defendant reiterated that, when he took out the knife, his intent had been only to scare Erickson and Malloe. After defendant showed Erickson and Malloe the knife, he "immediately" began swinging it. "Every motion my hand could go, I was swinging." He made "big circles." Erickson continued to come toward him and was stabbed by the knife. The knife fell out of defendant's hand. "I don't recall exactly how, but I know it fell out of my hand."

¶ 36    Defendant testified repeatedly that he did not know that he stabbed Erickson when at the scene of the murder. He did not feel Erickson's skin when he stabbed him. He did not see a stab wound on Erickson's chest. He did not see a second stab wound on Erickson's stomach. He was shown a picture of Erickson's wounds, and still he denied contemporaneous knowledge of the stabbing. He did not realize that he stabbed Erickson until the State charged him with first-degree murder.

¶ 37    Defendant acknowledged that, in a September 11, 2015, police interview, he told Detective Michael DiSera that he did not know what happened that night. He meant that he did not know

that his knife made contact with Erickson, not that he did not know he had been in a fight. He did, however, tell DiSera, that he "didn't do anything" and that he had "no idea" what led up to the fight. He explained that he did not tell DiSera that the fight concerned a stolen cell phone because he felt dizzy during the interview.

¶ 38     During redirect, defendant testified that, when he fled the scene, he ran "for [his] very life." Defendant had considered Erickson a friend, but "it was fair to say" that Rashunae and Christopher were better friends with Erickson. Defendant agreed that he told DiSera "some lies." He lied because he did not want to be involved in the case.

¶ 39                    D. Dr. Amanda Youmans

¶ 40     Youmans, an independent forensic pathologist, performed Erickson's autopsy to determine cause of death. Erickson was approximately 6 feet, 1 inch tall and 190 pounds. His blood alcohol level was .087. He had no illegal substances in his body.

¶ 41     Youmans documented a primary stab wound to Erickson's left chest area. The wound was one-and-three-fourths inches deep and three-fourths of an inch wide. The knife entered the chest cavity through the ribs and then penetrated the heart. Absent an open-heart surgery within five minutes of the stabbing, Erickson could not have been saved. The knife cut through "more than one" rib. It takes great force to thrust a weapon through bone and cartilage material, such as ribs. Youmans agreed, however, that the force could have been a result of defendant thrusting the knife into Erickson *or* of Erickson charging into the knife. Youmans could not be certain as to the length of the knife. The depth of a stab wound can be different than the length of the weapon due to the general property of the body and elasticity.

¶ 42     Youmans also documented a secondary stab wound to abdomen near the hip. That wound was one-half of an inch long and less than one-half of an inch deep and did not strike any organs.

Further, Erickson suffered several superficial abrasions to the head and face. The abrasion near Erickson's ear, which the State pointed to as evidence that defendant hit Erickson with a glass bottle, was best categorized as a tear and not a cut. Erickson had no skull fractures or brain injuries.

¶ 43                                    E. Investigating Officers

¶ 44    Several police officers testified to their investigation. Specifically, Brian Rolls testified that he participated in defendant's arrest at his mother's house. Defendant's mother gave him and the other officers permission to enter the house. They found defendant lying in his bed under the covers. Defendant was not wearing a shirt. Defendant was asked how he got a mark on his face, and he said that he got it lifting weights. Defendant did not resist arrest.

¶ 45    Officer Gene Morton testified to evidence collected at the scene. Following a grid search of the surrounding area, no glass bottle was found. Daniel Garcia, a crime scene investigator, photographed several knives found in defendant's home on September 11, 2015. The State believed that one of these knives, a clean Tomahawk knife photographed in the State's Exhibit No. 41, was the murder weapon. Garcia was told only to photograph the knives, not to collect them. At a subsequent search performed on September 25, 2015, the knife was not in the residence. An officer from the Kendall County Major Crimes Task Force testified that the failure to collect the knives on September 11, 2015, had been due to a "colossal miscommunication on [his] part." The murder weapon was never found.

¶ 46    Finally, in the rebuttal portion of its case, the State played several recordings of defendant's statements while in custody. The State played the recording from a September 21, 2015, jail call between defendant and Rashunae, wherein defendant told Rashunae that he planned to testify that the police caused his injuries. The State also published excerpts from defendant's September 11,

2015, interview with DiSera, wherein defendant told DiSera that he did not know what happened and he did not know what led up to the fight.

¶ 47                                    F. Closing Arguments

¶ 48    In closing, the State argued that defendant's theories of self-defense and accident were not supported by the evidence.  As to self-defense, the State observed that there were six elements to any self-defense claim (*i.e.*, the defendant was under threat of unlawful force, he was not the aggressor, the danger of harm was imminent, the use of force was necessary, he subjectively believed a danger existed that required the use of force applied, and his belief was objectively reasonable), and the State had to negate only one of the six elements.  To that end, the State urged that defendant's use of force was not necessary; defendant was not justified in using deadly force. Defendant had an opportunity to retreat and instead chose to draw a knife.  Next, as to accident, the State argued that defendant's story—that he swung the knife wildly without intent to harm and did not realize that he had stabbed Erickson—was incredible.

¶ 49    Defense counsel began by addressing the conflict between the theories of self-defense, which presumes an *intent* to use deadly force, and accident.  He cited to *People v. Everette*, 141 Ill. 2d 147, 156 (1990), which held that a defendant may be entitled to a self-defense instruction even when he testified that his harmful acts were accidental, so long as there is some evidence which, if believed, would support his self-defense claim.  Counsel then proceeded to advance defendant's self-defense claim, arguing that Erickson and Malloe were the aggressors and that defendant tried to extract himself from the situation before being pulled back into a second round of fighting.

¶ 50    The trial court rejected defendant's claim of self-defense.  It found that the State had negated not one but, at a minimum, three elements of defendant's self-defense claim: (1) the danger

of harm to defendant was not imminent; (2) the use of force by defendant was not necessary; and (3) defendant's beliefs were not objectively reasonable. The court did not expressly address defendant's claim of accident. However, the court did state that it generally found defendant to lack credibility. The court found Santana credible. The court also found Malloe credible, with qualification: "[W]hile there *** may be some minor discrepancies in his testimony when compared to [Santana's] testimony, the [c]ourt does not find those inconsistencies to be so consequential as to render the whole of [Malloe's] testimony unworthy of belief." The court convicted defendant of counts II, III, IV, and V, and sentenced him to 45 years' imprisonment. Defendant filed a posttrial motion, which the court denied. This appeal followed.

¶ 51                                    II. ANALYSIS

¶ 52     Defendant's primary argument on appeal is that the State failed to prove that he did not act in self-defense. Alternatively, he argues that his first-degree murder conviction should be reduced to involuntary manslaughter because he did not intend to injure Erickson and, instead, was merely reckless. For the reasons that follow, we reject defendant's arguments.

¶ 53                                 A. Self Defense

¶ 54     We first address defendant's claim of self-defense. Self-defense is an affirmative defense. *People v. Lee*, 213 Ill. 2d 218, 224 (2004). Once defendant raises self-defense by presenting some evidence tending to prove it, the State then has the burden of proving the defendant's guilt beyond a reasonable doubt as to that issue, together with all the other elements of the offense. *Id*. The elements of self-defense are: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of force applied; and (6) the beliefs of the person threatened

were objectively reasonable. *Id*. at 225; see also 720 ILCS 5/7-1(a) (West 2014) (a person "is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or bodily harm to himself"). If the State negates any one of these elements, the defendant's claim of self-defense fails. *Lee*, 213 Ill. 2d at 225. When reviewing the trial court's rejection of a defendant's self-defense claim, we view the evidence in a light most favorable to the prosecution and consider whether any rationale trier of fact could have found beyond a reasonable doubt that defendant did not act in self-defense. *Id*.

¶ 55    Defendant argues at length that the State failed to disprove element two, that defendant was not the initial aggressor. Defendant recounts that Erickson and Malloe "angrily confronted" defendant about the missing cell phone. They came ready for a fight, having changed out of their dress shirts and asked their girlfriends to drive getaway cars. They made so much noise upon arrival that Rashunae asked them to move down the street. Also, the first time that defendant tried to walk away, Erickson and Malloe pulled him back into the fight, "prevent[ing] him from extricating himself." Defendant further notes that Malloe's testimony that defendant acted as the initial aggressor when he hit Erickson with a glass bottle was not corroborated by any other witness and that no glass bottle was found at the scene.

¶ 56    We agree with defendant that Malloe's testimony contained inconsistencies and that there was evidence to support that Erickson and Malloe were the initial aggressors. Indeed, the trial court recognized that Malloe's testimony contained inconsistencies. Also, it declined to base its ruling on defendant's status as the initial aggressor and instead found that the State negated elements three, four, and six. However, it does not follow that establishing Erickson and Malloe as the initial aggressors secures defendant's self-defense claim because the State could still negate

any of the five remaining elements. Defendant appears to acknowledge this. He maintains, however, that accepting Erickson and Malloe as the initial aggressors substantiates his position that the danger of harm was imminent, the use of force was necessary, and his belief that a danger existed that required the use of force applied was objectively reasonable.

¶ 57 We disagree. Even accepting that Erickson and Malloe were the initial aggressors, a rational trier of fact still may have found that defendant was not justified in the use of force that was intended or likely to cause death or great bodily harm. Indeed, defendant made certain concessions that were consistent with the trial court's determination that the State negated elements three, four, and six. As to element three, portions of defendant's testimony were consistent with the trial court's determination that the danger of harm was not imminent. Defendant knew that neither Erickson nor Malloe carried a weapon and that the three were engaged in a fistfight only. When the fistfight worsened to a situation where Erickson and Malloe had defendant on the ground, the Negres interceded on defendant's behalf. As to element four, defendant's testimony was consistent with the trial court's determination that the use of force was not necessary. Defendant conceded that he had gotten away from Erickson and Malloe and, when he was six or seven feet from Erickson, *chose* to turn around and draw a knife. For these reasons, as to element six, the evidence also supported the trial court's conclusion that defendant could not have reasonably believed that a danger existed that required the amount of force applied.

¶ 58 In addition, Malloe's testimony, if believed, undoubtedly established that defendant's use of force was unreasonable. According to Malloe, the fight was not as severe as defendant described. Malloe "definitely" did not recall kicking defendant while defendant was on the ground. The fight did not begin or end as a two-against-one fight. The fight started between Erickson and defendant only, with Malloe and the Negre siblings trying to break it up. The fight

ended in a face-off between Erickson and defendant only, with Malloe standing beside Christy's car when defendant stabbed Erickson. The trial court expressly stated that it found Malloe's testimony to be credible as to the salient details. For these reasons, the evidence supports the trial court's decision to reject defendant's self-defense claim.

¶ 59                    B. First Degree-Murder Versus Involuntary Manslaughter

¶ 60    Defendant next argues that his first-degree murder conviction should be reduced to involuntary manslaughter, contending both that his due-process rights were violated and that the evidence was insufficient to support a conviction for first-degree murder. The State responds that defendant has forfeited this claim because he neither explicitly requested the trial court to consider the lesser offense of involuntary manslaughter, nor did he raise the request in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve a claimed error, a defendant must object both at trial and in a posttrial motion). We decline to strictly enforce the doctrine of forfeiture in this instance. Forfeiture is a limitation on the parties, not the courts. *Jill Knowles Enterprises, Inc. v. Dunkin*, 2017 IL App (2d) 160811, ¶ 22. The court may overlook forfeiture and address the merits when necessary to maintain a sound and uniform body of precedent or achieve a just result. *Id.* Here, defendant's due-process claim implicates a constitutional right. Also, to the extent that defendant raises a sufficiency argument, such claims are not subject to forfeiture. *People v. Cregan*, 2014 IL 113600, ¶ 16. Thus, we address defendant's arguments.

¶ 61    First, defendant contends that he was denied due process because the trial court did not consider all of the evidence before it. *People v. Mitchell*, 152 Ill. 2d 274, 322-23 (1992) (a trial court's failure to consider crucial evidence is a denial of due process). Specifically, defendant argues that the court did not consider: "evidence pertaining to [defendant's] mental state at the time of the stabbing even after testimony from [defendant] established that he did not intend to

hurt or kill [Erickson]." However, in support of his claim that the trial court did not consider all the evidence, defendant says nothing more than that the trial court improperly failed to reach the result urged by defendant. In a bench trial, the trial court is presumed to have considered all of the competent evidence unless that presumption is rebutted by affirmative evidence in the record. *People v. Gilbert*, 68 Ill. 2d 252, 258-59 (1977). The record in this case supports the presumption that the trial court considered all of the competent evidence. For example, the court expressly stated that it did not believe defendant's version of events, *i.e.*, it did not believe that defendant intended only to scare Erickson and did not know that he had stabbed him. Also, in finding defendant guilty of first-degree murder, it also expressly found that defendant stabbed Erickson with the intent to do great bodily harm and knowing that his act created a strong probability of death or great bodily harm. We reject defendant's claim that the trial court did not consider all of the evidence.

¶ 62 Second, defendant contends that, even if the trial court did consider all of the evidence, the evidence "failed to prove first-degree murder *** and, at most, proved the lesser offense of involuntary manslaughter." Defendant also posits that there was "insufficient evidence to establish that [he] acted intentionally or knew that his conduct would create a strong probability of death or great bodily harm." These are essentially sufficiency arguments. When a defendant challenges the sufficiency of the evidence on appeal, we consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). It is the responsibility of the trier of fact to assess witness credibility, resolve discrepancies in the witness testimony, and determine the weight to be given to witness testimony. *People v. Simon*, 2011 IL App (1st) 091197, ¶ 52.

¶ 63    First-degree murder requires a more culpable mental state than involuntary manslaughter. *People v. Eason*, 326 Ill. App. 3d 197, 209 (2001). Whereas first-degree murder requires intent, involuntary manslaughter requires only recklessness. 720 ILCS 5/9-3(a) (West 2014) (a person commits involuntary manslaughter when he "unintentionally kills an individual without lawful justification [and] his acts *** which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly"). The evidence establishes intent to commit first-degree murder when it shows that the defendant voluntarily and willfully committed an act that has the natural tendency to cause death or great bodily harm. *People v. Young*, 248 Ill. App. 3d 491, 510 (1993). The evidence establishes recklessness as required for involuntary manslaughter when it shows that the defendant "consciously disregard[ed] a substantial unjustifiable risk that circumstances exist or that a result w[ould] follow" and "such disregard constitute[d] a gross deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2014).

¶ 64    In considering whether the evidence establishes intent as opposed to recklessness in a case involving a physical altercation leading to death, the court may consider the following non-exhaustive list of factors: (1) a disparity in size between the defendant and the victim; (2) the brutality and duration of the beating; (3) the severity of the parties' injuries; (4) the infliction of multiple wounds; (5) the use of bare fists or a weapon; and (6) the relative defenselessness of the victim. See, *e.g.*, *People v. Foster*, 119 Ill. 2d 69, 88 (1987) (factors two and three); *People v. Brackett*, 117 Ill. 2d 170, 180 (1987) (factors one and five); and *People v. Trotter*, 178 Ill. App. 3d 292, 298 (1988) (factors four and six).

¶ 65    Looking to these factors, we first recognize that, even under Malloe's version of events, the fight was *at times* two-against-one. This may be thought of as a variant of factor one, a disparity

in the size between the defendant and the victim. Nevertheless, the Negres interceded on defendant's behalf when Erickson and Malloe knocked defendant to the ground. Also, at critical moments, such as the time of the stabbing, the fight was one-against-one. Thus, although helpful to defendant, the trial court was not required to find that the first factor weighed purely in defendant's favor. Moreover, the trial court may have reasonably determined that the other factors weighed against defendant. For example, as to factor two, the beating was not brutal. Defendant admitted that he did not need stitches or even a large bandage. Even more critically, defendant admitted that, when six to seven feet away from Erickson, he chose to turn around and draw a knife against persons he knew to be unarmed rather than run away (factors five and six). Moreover, Youmans testified that Erickson was stabbed *twice* and the fatal wound was the result of a forward-thrusting motion (factor four). It was also the result of great force, cutting through two ribs (factors three and five). This evidence is sufficient to establish that defendant voluntarily and willfully committed an act that has the natural tendency to cause death or great bodily harm. See *Young*, 248 Ill. App. 3d at 510.

¶ 66    We also note that the trial court was free to assess defendant's credibility and discount his testimony describing the act as reckless. *Simon*, 2011 IL App (1st) 091197, ¶ 52 (trier of fact is to assess witness credibility). Defendant testified that he displayed the knife only to scare Erickson and did not know that he stabbed Erickson. Defendant described his thrusts as wild and circular. The trial court may reasonably have determined that defendant's account conflicted with the physical evidence of a forward thrust. Similarly, it may have discredited defendant's assertion that he did not know that he had stabbed Erickson, where Youmans testified that the fatal wound was not a superficial grazing but a forceful stabbing cutting through two ribs, where Erickson suffered two stab wounds, and where defendant fled the scene. The court was further justified in

discrediting defendant's version of events where defendant demonstrated a general willingness to lie at various points in the investigation. Defendant told the arresting officers that his injuries were a result of lifting weights; defendant admitted that he told DiSera "some lies"; and defendant later told Rashunae in a recorded phone conversation that he intended to testify that the police injured him.

¶ 67 In sum, the evidence, viewed in a light most favorable to the State, established that defendant acted with the intent required of first-degree murder, that defendant was not merely reckless, and that defendant's conviction should not be reduced to involuntary manslaughter.

¶ 68                                    III. CONCLUSION

¶ 69 For the reasons stated, we affirm the trial court's judgment.

¶ 70 Affirmed.