2024 IL App (2d) 230048-U
No. 2-23-0048
Order filed August 9, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-269 |
| DAVID R. ACEVEDO, | ) ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE KENNEDY delivered the judgment of the court.
Justices Hutchinson and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in dismissing defendant's postconviction petition at the first stage of proceedings. Defense counsel's decision to forgo arguing second-degree murder was a matter of valid trial strategy and did not prejudice defendant where the trial court found incredible the only testimony in support of second-degree murder. Therefore, we affirm.

¶ 2    Defendant, David R. Acevedo, appeals from the trial court's dismissal of his postconviction petition at the first stage of postconviction proceedings. In his petition, defendant argued that both his trial counsel and appellate counsel provided ineffective assistance in failing to raise the issue

of imperfect self-defense, which would have reduced his first-degree murder conviction to second-degree murder. For the following reasons, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4      On September 14, 2015, defendant was charged by information with five counts of first-degree murder under section 9-1(a)(1), (2) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(1), (2) (West 2014)) for the fatal stabbing of Andrew Erickson. Counts one through five respectively alleged different mental states with which defendant stabbed Erickson: intent to kill, intent to cause great bodily harm, knowing such act would cause death, knowing such act created a strong probability of death, and knowing such act created a strong probability of great bodily harm. Defendant's fatal stabbing of Erickson was alleged to have occurred in the early morning of September 11, 2015, in a residential area of Plano on Cummins Street.

¶ 5      Defendant's case proceeded to a bench trial. We reviewed the testimony from his bench trial on his direct appeal (see *People v. Acevedo*, 2021 IL App (2d) 190575-U), and we recount the relevant testimony again here. In short, the State's theory of the case was that defendant stabbed Erickson when a dispute about a missing iPhone and some cigarettes escalated into a fight, despite neither Erickson nor anyone in his friend group being armed with a weapon. The defense raised a theory of self-defense: that Erickson and one of his friends picked a fight with defendant, pummeling him and making him fear for his life, and that defendant's intent in swinging his knife was to scare them away when Erickson walked into the knife.

¶ 6      Deputy Tyler Riffell of the Kendall County Sheriff's Office was one of the officers who testified for the State. He was on duty in the early morning hours of September 11, 2015, when he received a call around 7 a.m. for assistance in Plano. When he arrived on scene on Cummins Street, he found a male subject laying in the middle of the roadway with a group of people around him.

Riffell identified the man lying on the ground as Erickson. He observed that Erickson's shirt was off, and he saw a puncture wound on the left side of his chest; Erickson was not breathing and had no pulse. Riffell attempted CPR but was unable to revive Erickson. After a minute or two of CPR, paramedics from the Little Rock Fox Fire Protection District arrived on the scene. They pronounced Erickson dead at the scene.

¶ 7    Scott Schraft was a firefighter paramedic for the Little Rock Fox Fire District in Plano. He testified that he responded to the scene on September 11, 2015, where he found Erickson lying on the ground and Deputy Riffell performing CPR. Schraft and his partner assessed Erickson and continued CPR, but they found Erickson to be unconscious, not breathing, and in cardiac arrest. Schraft noted an "obvious stab wound" on Erickson's "left chest lower middle." Based on his training and experience, Erickson's injury appeared to be "an obvious fatal injury." Erickson was pronounced dead at the scene.

¶ 8    The State next called Felicia Santana. She was 25 years old and had been Erickson's girlfriend at the time of his death. They had been dating for about two months before he died but she had known him since elementary school. Santana was familiar with Chase Malloe, who she stated was Erickson's best friend and who she had known for as long as she had known Erickson. At the time of Erickson's death, Malloe was dating Monique Christy.

¶ 9    Santana testified that, on September 10, 2015, she went to Q Bar in Plano where she met Erickson, Malloe, and Christy. There, she drank two beers but had no more alcohol the rest of the night. They were at Q Bar for either an hour or a few hours. While there, a woman named Rashunae Negre came over and spoke with Erickson. Negre and Erickson were friends, and Santana knew her before that night, although she did not know that Negre and Erickson had gone to school together. Erickson and Negre's interaction was friendly with no hostilities or arguments.

¶ 10     Santana, Erickson, Malloe, and Christy eventually left Q Bar and went across the street to Hard Daze, which was another bar. They were not there long—maybe 15 to 20 minutes—and she again saw Negre, who was with some other people, including defendant and her brother Chris, who went by Luda. Their two groups played pool together, and it was a friendly interaction.

¶ 11     Santana, Erickson, Malloe, and Christy left Hard Daze and eventually went to Erickson's apartment. Prior to going to Erickson's apartment, Santana had an iPhone with a cracked screen and a case with a photo of Bob Marley on it. At Erickson's apartment, she last saw her phone on a table by the front door.

¶ 12     At some point at Erickson's apartment, defendant arrived, as well as Negre and Luda. After they left, Santana was unable to locate her phone. She spoke with Erickson about it and said she might have misplaced it. They tried calling her phone, but it was turned off. The battery had a full charge when she left the phone, so there was no reason for it to be off unless somebody turned it off. Erickson also noted that a pack of cigarettes was missing, but nothing else significant was missing.[1]

¶ 13     The four of them decided to go to Christy's home, although Santana was tired and did not want to go. She and Erickson drove separately from Christy and Malloe, and Santana followed Christy's car. Along the way, Christy stopped her car on Cummins Street, and Santana stopped too because she was following her. In front of Christy's vehicle were defendant, Luda, and Negre. To Santana's knowledge, they had no intention of meeting with those people again that night.

---

[1]Santana's phone was ultimately recovered by police. It was found near the crime scene on Cummins Street.

¶ 14    After Santana stopped, both Erickson and Malloe got out of their respective vehicles and approached the group that included defendant. Prior to Erickson getting out of the car, Santana had not seen him with a gun, knife, or other weapon. Santana and Christy remained inside the cars. Santana could hear "regular voice talking" but could not make out what was being said. At some point, the situation escalated: talking turned to yelling and shouting. Santana observed the group move from the side of the road into the street, and a brawl commenced. She could not tell who among the group were fighting.

¶ 15    Santana's car was still on, and she drove it toward the group hoping to disperse the brawl. It did not work, and the brawl continued. Santana parked her car and remained inside it. She saw Erickson and defendant go off toward the sidewalk, and she called out to Erickson, but he did not come back to her car. Instead, she saw him walk back into the street, where he let out a yell and collapsed onto the ground.

¶ 16    Santana went to Erickson and saw a wound and a lot of blood. She had not seen how Erickson became wounded. She took her hand and tried to put it over the wound to stop the bleeding. Her hand was slipping because of all the blood, and she took off her shirt to try to use it to stop the bleeding. At this point, Malloe came to assist her, and she started CPR, which she knew how to perform. Erickson started vomiting, and she cleared the vomit and continued with resuscitative measures until police arrived at the scene. Eventually medics arrived, and they pronounced Erickson dead at the scene. At that point in time, Malloe, Christy, and Luda were still present, but she did not see Negre or defendant.

¶ 17    Following Santana's testimony, Malloe testified as follows. He was 26 years old and had known Erickson since they were 15. They had been close friends. Malloe testified consistently with Santana's testimony regarding the lead-up to the confrontation on Cummins Street that

culminated in defendant stabbing Erickson. Malloe added that, after he, Erickson, Santana, and Christy returned to Erickson's apartment, defendant and his group came over and had beers in the kitchen, but they disappeared after 20 minutes without saying they were leaving. After defendant and his group left, Malloe noticed Erickson's cigarettes were missing, but that "wasn't a big deal." However, Santana's phone was also missing, and Malloe and Erickson decided to see if they could retrieve the cell phone.

¶ 18    While driving back toward Christy's house, they saw defendant sitting with others in a car on the side of Cummins Street. Malloe and Erickson got out of their cars, and Erickson spoke with defendant, Luda, and Negre. Malloe observed that, when defendant got out of his car, he was carrying a beer bottle, either "a glass tall boy or a 40."

¶ 19    Malloe testified that Erickson "was telling Negre and Luda, I trust you, I know you wouldn't take it," referring to Santana's missing iPhone. Erickson eventually turned to defendant and said, "I don't know—I don't know you and I don't trust you." When Erickson said this, defendant responded by swinging the beer bottle with his right hand at Erickson, hitting him on the left side of his head. Prior to defendant swinging the bottle at Erickson, Erickson had not made any threatening remarks to defendant other than that he did not trust him. Erickson never displayed any type of weapon, and Malloe denied personally having any weapon.

¶ 20    Defendant's act of hitting Erickson with the beer bottle caused a fight to break out between Erickson and defendant. Malloe tried to break up the fight, and, after defendant hit him, he hit defendant to try to get him to drop the bottle and get off Erickson. Luda and Negre also tried to break up the fight. Defendant and Erickson were wearing shirts when the fight started but both came out of their shirts when they were wrestling. After Erickson's shirt came off, defendant lunged toward him, and Malloe thought that defendant had hit Erickson with his right hand. Malloe

then heard Erickson yell that he had been stabbed. Erickson froze and put his right hand over the left side of his chest before taking a few steps toward Malloe and falling to the ground face-first.

¶ 21    Malloe looked down at Erickson and "was in shock" at what was happening. When Malloe looked back up, he saw defendant running at him with a knife in his right hand. Defendant swung at Malloe, but Malloe ducked, turned around, and ran around the side of a car. Defendant's knife came "[w]ithin a couple inches" of his face.

¶ 22    At this point, Malloe did not see Negre anymore, Luda was standing in shock, and defendant ran toward Negre's house. Malloe yelled for Santana and Christy to find something to stop Erickson's bleeding. Santana took off her shirt, and they used that. Malloe remained on scene until police arrived.

¶ 23    Dr. Amanda Youmans was an independent forensic pathologist, and she testified that Erickson had injuries to his face and head, including behind the left ear, that were the result of "a blunt object striking the skin." He also had stab wounds in his chest and abdomen. The stab wound in the abdomen was a "penetrating injury," but it did not hit any organs in the abdomen and was not a fatal injury. The stab wound to the chest, however, "entered the chest cavity through the ribs, and then penetrated the heart causing internal bleeding." The fact that the ribs were pierced was indicative of the force used: "it takes more force to thrust a weapon through bone and cartilage than it would through soft tissue such as muscle." The only measure that could have prevented Erickson's death from the stab wound to his heart would have been "immediate open heart surgery within minutes, *** like less than five minutes." It was her expert opinion that Erickson died from the stab wound to his chest.

¶ 24    Defendant testified in his own defense as follows. On the night of September 10, 2015, Negre and Luda picked him up from his house around 10 p.m., and they headed to Q Bar. He was

drinking that night; he estimated that he had four beers between 10 p.m. and 4 a.m. At Q Bar, he saw Erickson, who he knew from various parties around the Plano and Yorkville area. He also recognized Christy, who was someone he did not get along with well. When he introduced himself to Malloe, Malloe "just turned his head away."

¶ 25    Later, defendant ended up at Erickson's apartment. There were no problems or disagreements "[f]or the most part" at the apartment, and defendant and his friends eventually left to go to Luda's house, which was close to defendant's house. Before they got out of the car and went into the house, defendant "heard a screech, and two cars approached us to the left side." Erickson and Malloe exited their vehicles, and they were being loud and obnoxious and seemed belligerent. Defendant, Negre, and Luda exited the vehicle, and Erickson and Malloe approached defendant in the middle of the street. Defendant denied having a bottle in his hand.

¶ 26    Erickson said something to Luda and Negre about trusting them but said he did not trust defendant. Malloe was next to defendant and asked him "where is [*sic*] the cigarettes, where's the phone." Defendant responded that he did not smoke cigarettes and the only phone he had was his own. When he took out his phone to show it to Malloe, Erickson snatched it. Erickson then pulled his shirt over his head and said, "somebody is going to get fucked up." Following Erickson's outburst, Malloe hit defendant on the right side of his face. Defendant denied having struck anybody with anything, including a bottle, at this point in time.

¶ 27    After Malloe struck defendant, Erickson also hit defendant. After a third hit, defendant fell to the ground. They continued to strike him while he was on the ground. He put both his arms on the sides of his head and did his best to keep his head from hitting the concrete. He estimated he was down for 21 seconds. Luda and Negre tried to break things up, and defendant attempted to walk away, but he was struck in the back of the head. His hoodie was being pulled over his head,

and as he continued to receive blows, his nose started bleeding and he was in pain. Defendant "thought these guys were going to beat [him] to death."

¶ 28    At this point, defendant realized he had a pocketknife. He pulled it out of his right pants pocket. When he pulled it out, Erickson was coming towards him from approximately six or seven feet away. Defendant swung the knife "in a horizontal motion" and told Erickson to back up, but he continued to come towards him. He was trying to scare him off. Defendant admitted that neither Erickson nor Malloe had a knife and that, as far as he knew, neither were armed with any kind of weapon.

¶ 29    Defendant did not realize that he stabbed Erickson with the knife; he "just swung" in "[e]very motion my hand could go" and did not realize he made contact. Nevertheless, he did not dispute that he stabbed Erickson, agreeing on cross-examination that he was the one who stabbed Erickson on September 11, 2015. Defendant then dropped the knife, and Erickson kept coming at him, so he ran away. Defendant "might have" swung his knife at Malloe too before fleeing to his home.

¶ 30    The trial court found defendant guilty on counts two through five and not guilty on count one. Defendant was convicted of first-degree murder and sentenced to 45 years' imprisonment. Defendant filed his direct appeal on June 27, 2019.

¶ 31    In finding defendant guilty, the trial court stated that it found credible the testimony of the police officers, the firefighter paramedic, and the forensic pathologist. It also found credible the testimonies of Santana and Malloe. However, "as to [defendant's] overall testimony, the Court [found] he is not credible in his recitation of what he believes occurred in the early morning hours of September 11, 2015." The court stated that it had carefully considered defendant's testimony

both with respect to the incident that occurred in the early morning hours of September 11 and regarding his claim of self-defense.

¶ 32     Turning to defendant's affirmative defense of self-defense, the trial court found that the State had proved beyond a reasonable doubt that defendant did not act in self-defense. The court specified that the State had negated "at least" the following elements of self-defense: the danger of harm was imminent, the use of force was necessary, and the beliefs of the person threatened were objectively reasonable.

¶ 33     On direct appeal, defendant raised two issues: (1) the State failed to prove he did not act in self-defense, and (2) his first-degree murder conviction should have been reduced to involuntary manslaughter based on his mental state. *Acevedo*, 2021 IL App (2d) 190575-U, ¶ 52. We rejected both arguments, holding that the State sufficiently disproved defendant's claim of self-defense and that the evidence supported the intent required for his first-degree murder conviction. *Id.* ¶¶ 58, 67.

¶ 34     Through private counsel, defendant filed his postconviction petition on October 21, 2022. Therein, defendant argued that he received ineffective assistance of both trial and appellate counsel because of trial counsel's failure to argue that he was guilty of second-degree murder based on an unreasonable belief in the need to act in self-defense and appellate counsel's failure to raise the issue on direct appeal.

¶ 35     On January 12, 2023, the trial court dismissed the petition at the first stage of postconviction proceedings. It reasoned that defendant's trial counsel could have reasonably determined that arguing self-defense was the more appropriate trial strategy than arguing for second-degree murder, and it found that trial counsel's performance at trial was not deficient. Further, because it had determined that the underlying claims of trial counsel's ineffectiveness lacked support, it found defendant's claim that appellate counsel was ineffective was without

merit. The trial court therefore concluded that defendant's postconviction claims were patently without merit.

¶ 36    This timely appeal followed.

¶ 37                                    II. ANALYSIS

¶ 38    The issue on appeal is whether the trial court erred in dismissing defendant's postconviction petition at the first stage of postconviction proceedings. Defendant argues that the court erred because his petition raised an arguable claim that his trial and appellate counsels were ineffective for failing to raise "imperfect" self-defense—that is, to argue that defendant believed his actions were necessary to defend himself even though his belief was unreasonable. See *People v. Hodges*, 234 Ill. 2d 1, 24 (2009) (Garman, J., concurring in part) (explaining that mitigating first-degree murder to second-degree murder under section 9-2(a)(2) of the Code on the basis of an unreasonable belief that self-defense was required is commonly referred to as " 'imperfect self-defense' "). Defendant concedes that his trial counsel executed sound trial strategy in raising self-defense, but he contends that trial counsel acted unreasonably in failing to raise imperfect self-defense in the alternative and that appellate counsel acted unreasonably in failing to raise trial counsel's ineffectiveness on direct appeal.

¶ 39    At the threshold, we dispose of two issues the State raises about defendant's brief and argument. First, the State argues that we should strike defendant's statement of facts for failing to comply with Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020) (providing that the Statement of Facts shall contain facts necessary to an understanding of the case presented accurately and fairly). To the extent that defendant's statement of facts fails to provide a full account of the facts relevant to the disposition of this appeal, we are able to ascertain the pertinent

facts with the aid of the State's supplemental statement of facts. As mere striking of a portion of defendant's brief would be inconsequential to the disposition of this appeal, we decline to do so.

¶ 40　Second, the State argues that defendant forfeited the argument that his appellate counsel was ineffective because his postconviction petition did not explicitly describe his appellate counsel's deficient performance as a failure to argue trial counsel's ineffectiveness. Instead, the petition asserts that appellate counsel was ineffective for failing to argue generally the issue of imperfect self-defense as a basis to reduce his first-degree murder conviction to second-degree murder. Although the State's argument is technically correct, the only way for appellate counsel to have effectively argued the issue of imperfect self-defense on direct appeal would have required addressing trial counsel's failure to raise the issue below. See *People v. Simmons*, 2020 IL App (1st) 170650, ¶ 54 (although trial counsel failed to preserve an issue for appellate review, appellate counsel could have raised trial counsel's ineffectiveness in failing to preserve the issue). Thus, the first-stage postconviction petition, albeit unartfully drafted, at least implicitly raised the constitutional claim defendant argues on appeal. Moreover, forfeiture is a limitation on the parties, not on this court. *People v. Acosta*, 2024 IL App (2d) 230475, ¶ 15. We therefore decline to deem defendant's argument forfeited.

¶ 41　Turning to the merits of this appeal, defendant argues that his trial counsel's performance was deficient in failing to argue imperfect self-defense where the record shows that there was repeated, aggressive physical contact between defendant and Erickson and Malloe. Defendant argues that, although he did not believe they were armed, he testified that he was hit repeatedly during the fight and feared for his life. He concludes that, given the sufficient evidence to support imperfect self-defense and the lack of any legitimate reason not to argue imperfect self-defense, his trial counsel's performance was deficient for failing to raise the defense.

¶ 42    Defendant continues that his trial counsel's failure to raise imperfect self-defense was not only deficient but also prejudicial. Although he acknowledges that his claim of self-defense was rejected by the trial court and on direct appeal, he contends that findings against self-defense do not preclude that defendant actually and subjectively believed he needed to act in self-defense. For the following reasons, we reject defendant's arguments.

¶ 43    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)) provides a statutory remedy for criminal defendants who claim a violation of their constitutional rights. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act establishes a three-stage process for adjudicating postconviction petitions. *People v. Shipp*, 2015 IL App (2d) 131309, ¶ 6. At the first stage, the circuit court independently reviews the petition to determine whether the petition is frivolous or patently without merit, and a petition may be summarily dismissed as frivolous or patently without merit only if the petition has no arguable basis in fact or law. *People v. Tate*, 2012 IL 112214, ¶ 9; see also *People v. Edwards*, 197 Ill. 2d 239, 244 (2001) (explaining that a postconviction petition is frivolous or patently without merit when the allegations, taken as true and liberally construed, fail to present the " 'gist of a constitutional claim' "). "A petition lacking an arguable basis in law or fact is one 'based on an indisputably meritless legal theory or a fanciful factual allegation.' " *People v. Brown*, 236 Ill. 2d 175, 185 (2010). We review *de novo* the dismissal of a first-stage postconviction petition. *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 48.

¶ 44    To show a violation of the constitutional right to effective representation, a defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Dupree*, 2018 IL 122307, ¶ 44. The two prongs are that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) counsel's deficient performance

prejudiced defendant. *Id.* To establish prejudice, the defendant must show that, but for trial counsel's deficient performance, there was a reasonable probability that the result of the proceeding would have been different. *Id.* If an ineffective assistance of counsel claim fails on the prejudice prong, the court need not consider whether counsel's performance was deficient. *In re L.S.*, 2022 IL App (1st) 210824, ¶ 118. The *Strickland* standard for ineffective assistance of trial counsel applies equally to claims of ineffective assistance of appellate counsel. *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010).

¶ 45    Whether to request and argue imperfect self-defense in addition to self-defense is clearly a matter of valid trial strategy. *People v. Walton*, 378 Ill. App. 3d 580, 589 (2007) (explaining that it was valid trial strategy for counsel to pursue an " 'all-or-nothing defense' " of self-defense but not second-degree murder); see also *People v. Edmondson*, 2018 IL App (1st) 151381, ¶ 40 (whether to assert the affirmative defense of self-defense is itself a matter of trial strategy). When something is a matter of trial strategy, it is " 'virtually unchallengeable' and will generally not support an ineffective assistance of counsel claim." *Id.* Moreover, counsel cannot be said to have performed unreasonably simply because the trial strategy proved unsuccessful. *People v. Spiller*, 2016 IL App 133389, ¶ 39. Here, defendant has presented nothing that would suggest that his trial counsel's performance was anything other than an ultimately unsuccessful trial strategy in choosing to pursue acquittal based on self-defense.

¶ 46    Even if we were to find trial counsel's performance deficient, defendant cannot arguably show prejudice. Defendant had a bench trial where the trial court not only found defendant guilty but explained how it reached its finding. Critically, the trial court did not believe defendant's recitation of the events of the night of Erickson's murder, whereas it found Malloe's and Santana's accounts credible.

¶ 47    For the offense of second-degree murder, the defendant bears the burden to prove either of the mitigating factors under section 9-2(a) of the Code (see 720 ILCS 5/9-2(a)(1), (2) (West 2014)) by a preponderance of the evidence, including the mitigating factor of imperfect self-defense. *Id.* § 9-2(c); see also *People v. Washington*, 2012 IL 110283, ¶ 35 (quoting *People v. Jeffries*, 164 Ill. 2d 104, 129 (1995)). Given that the trial court found defendant's testimony incredible and that his testimony was the only testimony offered to support his version of events, there is simply no factual basis in the record to support a reasonable probability that the trial court would have found that defendant proved by a preponderance of the evidence that he actually believed he needed to act in self-defense. In other words, defendant's postconviction petition has no arguable basis in fact or law. See *Brown*, 236 Ill. 2d at 185 ("A claim completely contradicted by the record is an example of an indisputably meritless legal theory."). Thus, even if imperfect self-defense were not a matter of valid trial strategy, defendant's petition clearly failed to state the gist of a constitutional violation because he cannot show that his trial counsel's performance prejudiced him.

¶ 48    Our conclusion is further reinforced by the fact that a trial court presiding in a bench trial may *sua sponte* convict a defendant of second-degree murder without any request by defense counsel. *Spiller*, 2016 IL App 133389, ¶ 35. This is because second-degree murder is properly understood as a lesser-mitigated offense, not a lesser-included offense: the elements of first- and second-degree murder are the same with the only difference being the presence of a mitigating factor for second-degree murder. *People v. Rogers*, 286 Ill. App. 3d 825, 829-30 (1997) (citing *People v. Porter*, 168 Ill. 2d 201, 213 (1995)). Therefore, the general rule that a defendant cannot be convicted of an uncharged offense that is not a lesser-included offense is inapplicable. *Id.* at 830. In short, if the trial court had determined that the mitigating factor of imperfect self-defense were applicable in defendant's trial, it could have convicted defendant of second-degree murder

regardless of defense counsel arguing for second-degree murder, further militating against a finding that counsel's alleged deficient performance had any effect on the outcome of defendant's bench trial.

¶ 49     Having determined that defendant failed to state the gist of a claim that his trial counsel provided ineffective assistance, there is no arguable basis to find that appellate counsel was ineffective. *People v. Delgado*, 2022 IL App (2d) 210008, ¶ 25 ("[I]n considering whether a claim of ineffective assistance of appellate counsel would have merit, we must consider whether there would have been arguable merit to the underlying issue that appellate counsel failed to raise."). Accordingly, we hold that the trial court did not err in dismissing defendant's postconviction petition at the first stage of proceedings as patently without merit.

¶ 50                                   III. CONCLUSION

¶ 51     For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 52     Affirmed.